631 So.2d 212 (1993)
NCNB TEXAS NATIONAL BANK, N.A., now known as NationsBank of Texas, N.A., et al.
v.
Neva Watkins WEST, et al.
NCNB TEXAS NATIONAL BANK, N.A., now known as NationsBank of Texas, N.A., et al.
v.
Neva Watkins WEST, et al.
1920549, 1920550.
Supreme Court of Alabama.
October 8, 1993.
As Modified on Denial of Rehearing December 10, 1993.
*213 Victor T. Hudson and William W. Watts III of Reams, Philips, Brooks, Schell, Gaston & Hudson, P.C., Mobile, and Randy J. McClanahan, Houston, TX, for appellant.
Conrad P. Armbrecht, Edward A. Dean and Duane A. Graham of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile, for appellee.
SHORES, Justice.
This opinion addresses two appeals presenting the same issue of first impression.
These appeals involve two consolidated actions to quiet title to coalbed methane gas in, on, and under, land in Tuscaloosa County. The land was subject to 1953 and 1954 deeds from Phil Davant that conveyed his interest in coal and coal mining rights to Center Coal Company ("Center Coal") and reserved his interest in all gas.[1] The issue is whether a deed conveying all the coal and connected mining rights owned by the grantor, but specifically reserving the grantor's rights to all of the gas on the property, also reserves to the grantor all of the coalbed methane gas.[2] The resolution of this issue answers the question indirectly raised but not answered in Vines v. McKenzie Methane Corp., 619 So.2d 1305 (Ala.1993), that is, What is necessary for a grantor to convey separate estates in coal and coalbed methane gas?
The appellants in this case are the owners of a 22½% interest in all gas reserved by the deed in question. The appellees are owners/lessees of the coal rights conveyed by the deed. The appellant gas owners' interests *214 are represented in this case by a trust administered by NCNB Texas National Bank, N.A. ("NCNB"). For the sake of clarity, the appellants will hereinafter be referred to as the "gas owners" or as "NCNB," and the appellees will be referred to as the "coal owners."
On February 6, 1991, appellees Neva Watkins West, Wesley West Cattle Company, Jim Walter Resources, Inc. ("Jim Walter"), United Land Corporation, and Sonat Coal Gas, Inc., sued appellant NCNB Texas National Bank, N.A., now known as Nations-Bank of Texas, N.A. ("NCNB"), as trustee under the trust created by the last will and testament of Hortense E. Davant, seeking to quiet their title to coalbed methane gas in, on, and under, 40 acres of land in Tuscaloosa County.[3] NCNB counterclaimed, seeking to quiet its title to an undivided 22½% interest in all gas, including coalbed methane gas, contained within the lands described in the February 27, 1953, deed from Phil Davant to Center Coal Company; these lands (the "Property") include the 40 acres at issue in the original complaint. Because some of the appellee coal owners had been producing and marketing coalbed methane gas from the Property, the counterclaim sought declaratory relief, damages for conversion, and an accounting as to the proceeds from the sale of NCNB's alleged interest in the gas already produced from the Property by certain counterclaim defendants.
NCNB moved on behalf of the appellant gas owners to consolidate with this action an action that it had filed against Center Coal Company, Ltd., Black Warrior Methane Corporation, Black Warrior Transmission Corporation, Southern Natural Gas Company, and certain trusts, all of which were involved in production and marketing of coalbed methane gas from the Property. The trial court granted the motion to consolidate and severed certain claims against Black Warrior Transmission Corporation, Southern Natural Gas Company, and Center Coal Company for a separate trial.
In response to a special interrogatory at the conclusion of the consolidated trial on September 24, 1992, the jury determined that all of the gas produced from the Property was coalbed gas and that none of the gas resided in non-coal strata before disturbance of the coal.[4] The jury returned a verdict in favor of appellees Black Warrior Methane Corporation and Sonat Coal Gas, Inc., on NCNB's claims for damages for the alleged production and sale of gas other than coalbed methane gas. The trial court then addressed the legal issue of the ownership of the coalbed methane gas in a final order and judgment entered December 31, 1992, which reads in part:

"FINAL ORDER AND JUDGMENT AMENDED AND REISSUED SUA SPONTE
"The trial of these consolidated cases commenced on September 14, 1992, and lasted for ten days. This Court heard and reviewed the evidence presented and considered the arguments of counsel concerning matters of law, and the jury returned a verdict concerning the issues of fact. The issues, findings, conclusions, and rulings are stated below.
"1. These consolidated cases involve basically two disputes. One is the question of who owns the Coalbed Gas ... in the property described in Exhibits A and B hereto [taken from the 1953 and 1954 deeds to Center Coal]; and the other dispute is a factual question concerning whether all of the hydrocarbon gas production from gob wells in the Brookwood Coal Degasification Field in Tuscaloosa County, Alabama, is Coalbed Gas.
"....
"3. While many entities are parties to this lawsuit, they are conveniently and *215 agreeably aligned and allied into just two opposing camps. To be concise, this decree will refer to one camp as the `Jim Walter Parties' and the other camp as the `Trustee Bank.'
"The Jim Walter Parties consist of Jim Walter Resources, Inc., Black Warrior Methane Corp., and Sonat Coal Gas Inc., which hold rights or interests under leases granted by the owners of the coal in and under said property, and Neva Watkins West, Wesley West Cattle Company, Wesley West Mineral Corporation, and the Betty Ann Stedman Trust [and other trusts of members of the Stedman family], who own coal and mining rights in and under said property. The Trustee Bank is NCNB Texas National Bank (now known as NationsBank of Texas), as trustee under the last will and testament of Hortense E. Davant and also as sole trustee under that certain agreement of trust dated November 19, 1986, between the beneficiaries of the Hortense E. Davant testamentary trust and InterFirst Bank, Corsicana, N.A. The Trustee Bank owns an undivided 22.5% interest in the oil, gas, petroleum, and sulfur in, on, and under the real property in question but owns no interest in the coal and mining rights. [Emphasis added.]
"4. These lawsuits arose because the Jim Walter Parties not only have been ventilating Coalbed Gas from their mines and coal seams but also have been producing and selling it. The Trustee Bank also alleged that the Jim Walter Parties produced other gas from non-coal strata.
"The Jim Walter Parties have produced the Coalbed Gas by three types of wells: gob wells, horizontal boreholes, and vertical degasification wells. A basic understanding of each of these production methods promotes clear analysis of the issues in these cases.
"A gob well is one drilled from the surface of the earth down to a stratum where Coalbed Gas released from a coal mine `gob' can be extracted. The gob is produced by the longwall mining method, in which a huge machine grinds progressively into a face, or `wall,' in the coal seam to tear away the coal, which is then conveyed to the surface. As the mining machine grinds further and further into the wall, it leaves behind it a void into which the ceiling of the mine collapses [creating a `gob' of rubble] and into which great quantities of Coalbed Gas collect. The collapse of the ceiling of the mine also leaves the overlying strata unsupported, and gravity causes them to subside and to fracture. Some degree of subsidence extends all the way to the surface, and the fractures in the overlying strata extend from the gob area upward toward the surface. Thus, Coalbed Gas from the gob may travel upward into non-coal strata, where it may be collected and extracted through the gob well. Of all three methods of Coalbed Gas production, this one is the most prolific.[[5]]
"A horizontal borehole is, as the name implies, a hole bored horizontally into the coal seam from a point within the coal mine itself. The seam releases some of its adsorbed or trapped Coalbed Gas into the borehole from which the gas may then be produced.
"Finally, a vertical degasification well is one drilled more or less vertically from the surface and directly into an unmined coal seam to extract such Coalbed Gas as may be trapped or collected. The release of the Coalbed Gas from the coal seam into the vertical degasification well may be increased by various methods of fracturing the coal seam in the vicinity of the bottom of the well. The fracturing methods generally involve forcing water, other substances, or a combination thereof down the well and into the coal seam. An emerging method is to blast water out the bottom end of the well so violently that it rips out an area of coal. This method may evolve into a way of producing not only Coalbed Gas but also coal itself.
"In the course of their mining in the Brookwood Field, the Jim Walter Parties have been producing Coalbed Gas by gob *216 wells and by horizontal boreholes. In addition, in preparation for mining, the Jim Walter Parties have been producing Coalbed Gas from vertical degasification wells. The Jim Walter Parties claim that all three production methods are necessary to the safe degasification of the mines, just as are the massive fan-driven ventilation systems. The Jim Walter Parties, predictably, want to keep the production and its proceeds; but the Trustee Bank, as an owner of a fractional interest in gas, asserts claims to various portions of the production on various theories, which this decree will discuss in due course.
"5. Several of the Jim Walter Parties initiated this litigation by filing the complaint in Civil Action No. 91-443 requesting declaratory and quiet title relief with respect to 40 acres of the property in question. Basically, the request was for the Court to declare that the `coal' owner owned all of the Coalbed Gas in and under the property. The Trustee Bank counterclaimed for similar declaratory and quiet title relief for all of the property in question, except that it asked the Court to declare that the `oil and gas' owner owned the Coalbed Gas. Because the Jim Walter Parties had admittedly produced Coalbed Gas and had allegedly produced other gas as well, the counterclaim further sought damages under various theories, including conversion and waste.
"6. Inasmuch as certain necessary parties to the counterclaim in Civil Action No. 91-443 were not before the Court, the Trustee Bank filed its complaint in Civil Action No. 92-2496 against the remaining Jim Walter Parties and others and stated claims similar to those made in its counterclaim. On motion of the Trustee Bank, the Court consolidated the two actions (CV 91-443 and 92-2496) but, for trial purposes, severed defendants Southern Natural Gas Company and Center Coal Company in Civil Action No. 92-249[[6]]
"7. The crucial title question as set forth by the pleadings in these consolidated actions depends on the meaning of two basically identical deeds (the `Center Coal Deeds'): (a) Deed from Phil E. Davant, et al., to Center Coal Company dated February 27, 1953, and recorded in Book 340, page 271 of the records maintained by the Judge of Probate of Tuscaloosa County, Alabama; and (b) Deed from Phil E. Davant, et al., to Center Coal Company dated February 1, 1954, and recorded in Book 420, page 193 of said records. At the time the Center Coal Deeds were executed, the grantor therein owned an undivided 45% interest in the minerals (but not the surface) of the property covered by the deeds.
"8. The Center Coal Deeds granted and conveyed to the predecessor of the Jim Walter Parties `all of the coal, and mining rights' owned by the grantor in the property in question and contained the following intention clause:
"`It is the intention of the undersigned Grantor to convey by this instrument the undivided interest of the undersigned Grantor in all the coal, and mining rights owned by the Grantor in connection with such undivided interest, in, under and upon Township 19, Ranges 7 and 8, ... Tuscaloosa County, Alabama, whether all of the interest so owned by the undersigned Grantor is hereinafter specifically described or not.'
"The Jim Walter Parties contend that this language effectively conveyed both the coal and the Coalbed Gas.
"9. The Center Coal Deeds also reserved in favor of the Trustee Bank's predecessor everything that was not conveyed, including `all of the oil, gas, petroleum, and sulphur.' Specifically, the Deeds contained the following language:
"`The undersigned Grantor specifically reserves all interest which he may have in said land other than the above-described interests in coal and mining rights held in connection with said interests in said coal, and without limiting the generality of the foregoing, the undersigned Grantor specifically reserves all *217 of the oil, gas, petroleum and sulphur in, on and under and that may be produced from any part thereof, together with the full right of ingress and egress to and from said lands and with the full and exclusive right at all times to enter upon said lands to explore, develop, operate and occupy said lands for the purpose of exploring, mining, drilling and developing the said lands and holdings for the production of oil, gas, petroleum and sulphur, or any one or more of them, and for removing the same therefrom, and for the storing, handling, transporting and marketing of the same, and together with the full use of such amount of the surface of said lands as is necessary or useful to explore, produce, store, refine, extract, absorb, treat, transport and remove such oil, gas, petroleum and sulphur and to conduct all operations therefor, and to erect and use thereon all buildings, derricks, tanks, structures, machinery and equipment as may be necessary or proper for such purposes, and together with the right to lay and operate thereon pipelines, telephone and telegraph lines, and to repair and remove from said land any of the Grantor's property thereon at any time, including the right to inject or return gas, water, brine or other substances in the subsurface strata in and under said lands or any part thereof, including the right to drill input wells or shafts for those purposes and, in addition and without limiting the foregoing, each and every other right and privilege necessary and proper for the full enjoyment of the ownership of all such oil, gas, petroleum and sulphur in, on, under and that may be produced from said lands, and each and every right incident to Grantor's full ownership thereof.'
"The Trustee Bank has succeeded to one-half of the interest reserved by the grantor above and claims that it now owns an undivided 22.5% interest in Coalbed Gas by virtue of the above-quoted language.
"10. The Court finds that the Center Coal Deeds are not ambiguous. The Court finds that none of the parties to the deeds specifically contemplated Coalbed Gas....
"....
"11. The omission of any specific reference to Coalbed Gas in the Center Coal Deeds and the need for uniformity and predictability in the law of real property and minerals require this Court to declare, as a matter of law, whether Coalbed Gas belongs to `coal' owners/lessees or to `oil and gas' owners/lessees in circumstances where separate ownership of those minerals exists and where the title instruments do not specifically address the ownership of Coalbed Gas. In making this determination of law, the Court must consider fully the natural characteristics of Coalbed Gas; the methods, rights, and obligations of mining and extraction; and the ways parties have dealt with mineral rights.
"....
"12. At trial, each side presented evidence and a number of cogent arguments why the Coalbed Gas should be declared the property of that side. Some notable examples of cogent opposing arguments are worthy of recognition and are summarized below.
"The Trustee Bank argues that the chemical composition of Coalbed Gas is practically the same as, and occasionally identical to, the chemical composition of natural gas, as each substance is mostly methane, with only very small percentages of other ingredients. The Jim Walter Parties counter that the coal forming process created the Coalbed Gas as a by-product or a co-product of the coal, that the Coalbed Gas has a natural and unique affinity for coal, and that coal has a uniquely great capacity for holding Coalbed Gas by adsorption. Thus, on the basis of the physical properties of the substances, the Trustee Bank claims the Coalbed Gas should be deemed `gas,' and the Jim Walter Parties claim the Coalbed Gas should be deemed `coal.'
"The Trustee Bank further argues that, inasmuch as Coalbed Gas, when produced at the wellhead, functions as natural gas, the gas owners have a normal and natural expectation of ownership of the Coalbed Gas. The Jim Walter Parties counter that *218 the coal owner cannot mine the coal without removing the Coalbed Gas because the Coalbed Gas, abundantly contained in virtually all coal, poses the perils of explosion and asphyxiation. Thus, the Trustee Bank claims the Coalbed Gas should be deemed `gas,' and the Jim Walter Parties claim the Coalbed Gas should be deemed `coal' because of its function or effect. [Emphasis original.]
"The Trustee Bank argues still further that the methods of producing Coalbed Gas are, in varying degrees, similar to the methods of producing natural gas and that emerging methods of producing natural gas from other strata are adaptable to producing Coalbed Gas from coal strata. The Jim Walter Parties counter that gob wells, producing from the `gobs' left by the longwall coal mining, produce most of the Coalbed Gas; that only coal miners drill horizontal boreholes, and then principally to degasify the mine for the sake of safety; and that the coal owner needs to control the production of Coalbed Gas by other methods such as hydrofraccing under vertical wells in order to maintain the safety of the mines and the value of the coal seam. Thus, the Trustee Bank claims Coalbed Gas should be deemed `gas,' and the Jim Walter Parties claim the Coalbed gas should be deemed `coal' because of the methods and practicalities of extracting it. [Emphasis original.]
"In the sets of opposing arguments summarized above, the evidence supports the factual premises of both sides, largely without dispute. Each side is simply offering a different analysis of established facts or respectable assertions.
"The two sides also argue the legal practicalities. The Trustee Bank says the simplicity of a holding that `gas is gas' will avoid the litigation that may arise from disputes over the source of the gas. The Jim Walter Parties respond that a `gas is gas' rule would foment litigation from disputes between coal owners and gas owners over the timing and methods of exploiting coal seams. Neither side offered evidence on the anticipated comparative volumes of future litigation.
"....
"13. Ten days of brilliant trial presentations by both sides on the issues and arguments gave the Court a wealth of evidence and analysis. In addition, during the months preceding the trial, the two sides exhaustively briefed their assertions; and the Court studied the briefs, the exhibits, the pleadings, and all other contents of the record. On the basis of all of this background, the Court concludes that the evidence and the competing arguments fail to show a clear mandate in favor of holding that Coalbed Gas belongs to the gas owners. In other words, for every good argument the gas owners present that they should own the Coalbed Gas, the coal owners present an equal and opposite argument that they should own it.
"The one compelling mandate the Court observes from its entire consideration of every aspect of these cases is the legal precedent afforded by the Hoge decision [United States Steel Corp. v. Hoge, 503 Pa. 140, 468 A.2d 1380 (1983),] by the Supreme Court of Pennsylvania. Hoge is the only reported case decision in the United States directly and precisely addressing the crucial issue: and the holding of Hoge is that the Coalbed Gas belongs to the owner of the coal. To the extent that any minor distinctions in facts or rationale exist between Hoge and the cases at bar, they are outweighed by the need for continuity and predictability in the law of real property and minerals. Further, because the Trustee Bank claims not only the Coalbed Gas residing in the coal itself but also the Coalbed Gas entering gob wells from fractured non-coal strata above the coal seam and the gob, the holding in the cases at bar extends to all Coalbed Gas ... whether or not residing in the coal itself. [Emphasis original.]
"14. Accordingly, this Court holds, as a matter of law, that the `coal' owners/lessees own the Coalbed Gas, and the `oil and gas' owners/lessees do not. The Center Coal Deeds served, as a matter of law, to pass from the grantors to the grantee title to all of the coal and Coalbed Gas owned by the grantors in, on, or under the property covered by the Deeds.

*219 "15. The Trustee Bank owns no right, title, or interest in or to the coal or the Coalbed Gas in, on, or under the real property located in Tuscaloosa County, Alabama, more particularly described in Exhibits `A' and `B' attached hereto and made a part hereof. [Omitted from this opinion.]
"[The court then held that the holders of the title to the coal and the lessees of the right to produce the coal also had rights in the coalbed methane gas.]
"19. The Court finds that a justiciable controversy exists between the Trustee Bank and the Jim Walter Parties as to whether or not all of the production from gob wells and future gob wells in the Brookwood Coal Degasification Field is or will be, in fact, Coalbed Gas. If it is and will be, the Jim Walter Parties own it and will own it, according to the main holding of this decree. The Jim Walter Parties presently intend to drill additional gob wells on portions of the property in question, and the Trustee Bank, which owns an undivided interest in gas other than Coalbed Gas in the property in question, may, for each future gob well, claim that some of its production will derive from non-coal strata so as to be natural gas and not Coalbed Gas. The evidence proves without conflict that no material difference exists in the strata or production techniques from place to place across the Brookwood Field. Declaratory relief is thus appropriate under Ala.Code [1975], § 6-6-220 et seq.

"IT IS, THEREFORE, ORDERED, ADJUDGED, and DECREED that all production from gob wells heretofore or hereafter drilled on any of the property described in Exhibits `A' and `B' is hereby declared to be Coalbed Gas, and that, as to all of said property, the owners of the coal and Coalbed Gas as described above, together with their lessees, are hereby declared to have the exclusive right to produce, and upon production to own, all of the production from gob wells and all other Coalbed Gas produced from any portion of said property by means of horizontal boreholes, vertical degasification wells, or mine ventilation.
"IT IS FURTHER ORDERED, ADJUDGED, and DECREED that the Trustee Bank owns no right, title, or interest in or to the coal or the Coalbed Gas in, on, or under the real property described in Exhibits `A' and `B' hereto and that all of such coal and Coalbed Gas is owned by the coal owners/lessees as set forth above in this Final Order and Judgment.
"IT IS FURTHER ORDERED, ADJUDGED, and DECREED that judgment be, and it is hereby, entered in favor of Black Warrior Methane Corp., Sonat Coal Gas, Inc., Jim Walter Resources, Inc., United Land Corporation, Neva Watkins West, Wesley West Cattle Company, Wesley West Mineral Corporation, the Betty Ann Stedman Trust, the Clare Stedman Trust, the Lynn Stedman Trust, and the Stuart West Stedman Trust and against the Trustee Bank as to all claims set forth in the complaint (as amended) and in the counterclaim (as amended) in Civil Action No. CV-91-443 and as to all claims set forth in the complaint in Civil Action No. 92-2496, and that all costs of court in these proceedings be, and the same hereby are, taxed to said Trustee Bank, for the recovery of which let execution issue.
"DONE and ENTERED this 31st day of December, 1992.
 "/s/ Douglas Johnstone
 "CIRCUIT JUDGE"
C.R. 1373-91.
NCNB, on behalf of the gas owners, appeals from this judgment. We affirm in part, reverse in part, and remand.
The dispositive issue is whether the 1953 Davant deed to Center Coal Company transferred the rights to coalbed methane gas to the grantee of the coal rights, or whether it reserved the rights to coalbed methane gas to the grantor. The deed contains the following language:
"KNOW ALL MEN BY THESE PRESENTS: That for and in consideration of the sum of Ten Thousand Dollars ($10,000.00) cash in hand paid to the undersigned PHIL E. DAVANT (hereinafter called Grantor) by CENTER COAL COMPANY, *220 a corporation (hereinafter called Grantee), and other good and valuable considerations, the receipt and sufficiency whereof are hereby acknowledged by the undersigned Grantor, we, the undersigned Phil E. Davant and Grace Keller Davant, his wife, have granted, bargained, sold and conveyed, and do by these presents grant, bargain, alien, sell and convey unto said Grantee the following property and interests in property, namely:
"An undivided 45% interest in all the coal, and mining rights owned by the Grantor in connection with such undivided interest, in, under and upon all those parts or portions of the following described lands which lie east of the Warrior River and within the limits of Tuscaloosa County, Alabama, namely:
"[The deed describes property within Township 19 South, Range 7 West, and Township 19 South, Range 8 West.]
"TO HAVE AND TO HOLD to the grantee forever but subject, however, to outstanding coal leases heretofore executed by the Grantor and his wife, together with Wesley W. West and his wife, and P.M. Stevenson and his wife, but including in the property hereby sold and conveyed all the right, title, interest and estate of the undersigned Grantor in and to the said leases and benefits hereafter to accrue therefrom.
"It is the intention of the undersigned Grantor to convey by this instrument the undivided interest of the undersigned Grantor in all the coal, and mining rights owned by the Grantor in connection with such undivided interest, in, under and upon Township 19, Ranges 7 and 8, ... Tuscaloosa County, Alabama, whether all of the interest so owned by the undersigned Grantor is hereinafter specifically described or not.
"The undersigned Grantor specifically reserves all interests which he may have in said land other than the above-described interests in coal and mining rights held in connection with said interests in said coal, and without limiting the generality of the foregoing, the undersigned Grantor specifically reserves all of the oil, gas, petroleum and sulphur in, on and under and that may be produced from any part thereof, together with the full right of ingress and egress to and from said lands and with the full and exclusive right at all times to enter upon said lands to explore, develop, operate and occupy said lands for the purpose of exploring, mining, drilling and developing the said lands and holdings for the production of oil, gas, petroleum and sulphur, or any one or more of them, and for removing the same therefrom, and for the storing, handling, transporting and marketing of the same, and together with the full use of such amount of the surface of said lands as is necessary or useful to explore, produce, store, refine, extract, absorb, treat, transport and remove such oil, gas, petroleum and sulphur and to conduct all operations therefor, and to erect and use thereon all buildings, derricks, tanks, structures, machinery and equipment as may be necessary or proper for such purposes, and together with the right to lay and operate thereon pipelines, telephone and telegraph lines, and to repair and remove from said land any of the Grantor's property thereon at any time, including the right to inject or return gas, water, brine or other substances in the subsurface strata in and under said lands or any part thereof, including the right to drill input wells or shafts for those purposes and, in addition and without limiting the foregoing, each and every other right and privilege necessary and proper for the full enjoyment of the ownership of all such oil, gas, petroleum and sulphur in, on, under and that may be produced from said lands, and each and every right incident to Grantor's full ownership thereof."
Does this language convey to the coal owners all coalbed methane gas as a matter of law, notwithstanding the reservations clause, which expressly reserves to the grantor "all... gas" and the exclusive right to produce gas and other rights incidental and necessary to the full enjoyment of the gas estate? We cannot agree with the trial court that the Davant deeds, as a matter of law, conveyed to the coal owners all coalbed methane gas and that, as a matter of law, the reservation *221 of all gas includes no interest in coalbed methane gas.
In Vines v. McKenzie Methane Corp., we held that methane gas was included in an express grant of the mineral estate where the granting clause of the deed conveyed "all the coal and other minerals" and where the deeds contained no other limiting language and reserved only surface rights, and no mining or mineral rights, to the grantor. In Vines, we stated: "[W]e are not inclined to hold that a grantor may never grant separate estates in coal and coalbed methane gas. Rather, in keeping with earlier Alabama law construing mineral leases, we hold that an express grant of `all [the] coal [and other minerals]' necessarily implies the grant of coalbed methane gas, unless the language of the grant itself prevents this construction." 619 So.2d at 1309 ("never" emphasized in original; other emphasis added).
All of the parties to this litigation, and all of the authority to which we have been cited and all that we have found independently, agree that coal is a separate and severable interest in real property, that gas is a separate and severable interest in real property, and that methane gas is a gas and is also a separate and severable interest in real property. We must decide what interests the Davant deeds conveyed and what interests those deeds reserved in the grantor. Vines held only that, when there is no reservation other than of surface rights, an express grant of "all coal and other minerals" conveyed, and did not reserve in the grantor, an interest in coalbed methane gas. Vines did not expressly address the issue raised by this appeal, but Vines did say that "unless the language of the grant itself prevents this construction," a grant of all coal and other minerals also conveyed methane gas. The Davant deeds in this case do contain language which "prevents a construction" by which the grant of coal necessarily includes a grant of coalbed methane gas. These deeds expressly reserve to the grantor
"all of the ... gas ... in, on and under and that may be produced from any part [of the Property], together with ... the full and exclusive right at all times to enter upon ... and occupy said lands for the purpose of ... developing the said lands and holdings for the production of ... gas... and, in addition and without limiting the foregoing, each and every other right and privilege necessary and proper for the full enjoyment of the ownership of all such... gas ... in, on, under and that may be produced from said lands, and each and every right incident to Grantor's full ownership thereof."
The trial court held that the Davant deeds were unambiguous and held that, as a matter of law, the conveyance of coal interests carried with it a conveyance of all coalbed methane gas interests, notwithstanding this language of the deeds expressly reserving to the grantors all gas and all rights incident and necessary to the full enjoyment of the gas estate. We must determine what the parties intended by the grant of coal interests and the reservation of gas interests in the Davant deeds.
"The basic objective in construing the terms of a deed is to ascertain the intention of the parties, especially the grantor, and if that intention can be found from the entire instrument, arbitrary rules of construction need not be used." Turner v. Lassiter, 484 So.2d 378, 379 (Ala.1985). "In ascertaining the intention of the parties, the plain and clear meaning of the deed's terms must be given effect, and parties must be legally presumed to have intended what is plainly and clearly set out." Financial Inv. Corp. v. Tukabatchee Area Council, Inc., 353 So.2d 1389, 1391 (Ala.1977) (emphasis original) (citation omitted). In determining the intention of the parties to a deed, "every distinct provision in a conveyance is presumed to have been inserted for a purpose." Howell Petroleum Corp. v. Holliman, 504 So.2d 277, 278 (Ala.1987).
"[W]here a deed is of doubtful meaning, or where the language of a deed is ambiguous, the intent of the parties to the deed as to what property is conveyed may be ascertained by reference to facts existing when the instrument was made, to which the parties may be presumed to have had reference.

*222 "However, if the language is plain and certain, acts and declarations of the parties cannot be resorted to, to aid construction."
Financial Inv. Corp., supra, at 1391 (citations omitted); Exxon Corp. v. Waite, 564 So.2d 941, 943 (Ala.1990).
We agree that the language of the deed is unambiguous. However, we disagree with the trial court's holding that, as a matter of law, a reservation of "all gas" does not include coalbed methane gas. To reach this determination, we have looked to what scant authority there is on the issue, as the trial court did, to the plain meaning of the words used in the deed, and to basic principles of property law.
Because the language of the deed is unambiguous, we look to the plain language of the deed, in light of the existing tenets of property law, assuming, as we must, that every distinct provision of the deed has a purpose. We hold that because the intention of the parties is apparent from the entirety of the deed, the trial court erred in resorting to arbitrary rules of construction to determine what the parties intended by the reservation of gas and the grant of coal and mining rights.
The language of the deed is unambiguous. It "specifically reserves all interests" of the grantor other than "all coal, and mining rights [associated with the coal]" on those lands covered by the deed. The deed "specifically reserves [to the grantor] all of the oil, gas, petroleum, and sulphur in, on and under and that may be produced from any part thereof [of the lands in the deed]."
Clearly, coal is a part of the lands. Gulf Coal & Coke Co. v. Alabama Coal & Coke Co., 145 Ala. 228, 231, 40 So. 397, 398 (1906). NCNB contends that the reservation of all gas that may be produced from any part of the lands must, therefore, include all gas produced from the coal as well. However, ownership of the coal was transferred to the appellee coal owners' predecessors in interest by the grant of all coal and coal mining rights and the incidents thereto. The parties do not dispute that the coalbed methane gas being produced from the Property is, in fact, gas. Evidence at trial indicated that coalbed methane gas is a gas with a composition similar to, if not exactly the same as, other natural methane gas.[7] We can find no scientific or legal basis to support the proposition that coalbed methane gas should be treated as a resource separate and distinct from other natural gas, or from any other gas.[8] The fact that the coalbed methane gas is produced by, and stored within, coal seams does not require the conclusion that a grant of "all coal" includes coalbed methane gas, nor does it require the conclusion that a reservation of "all gas" does not include *223 coalbed methane gas.[9] As we said in Turner v. Lassiter, "Under the facts of this case: `All' is all. `All' is not ambiguous. `All' is not vague. `All' is not of doubtful meaning." 484 So.2d at 380.[10] However, careful analysis of the law of real property indicates that the ownership of coalbed gas depends upon its location at the time the gas is recovered or "captured," at which time it is reduced to possession.
Since early times, courts have held that ownership of property consists of a bundle of rights; every distinct portion of that bundle may be severed and conveyed away at the will of the owner. Thus, the owner of a parcel of land has rights to the resources contained on, within, and underneath, that parcel. The owner retains such rights to the property as he does not grant, lease, or otherwise convey away. In conveying rights to certain resources, the owner may specifically reserve rights to other resources. In this case, Davant conveyed his coal rights and all rights incident to mining that coal, but he specifically reserved rights to all gas. No one disputes that the gas contained within a property is a distinct interest in land subject to separate ownership and severable from other interests.
Alabama determines ownership of oil and gas under the nonownership theory, which recognizes the migratory nature of oil and gas and requires actual possession to establish ownership. Sun Oil Co. v. Oswell, 258 Ala. 326, 332, 62 So.2d 783, 787 (1953); 1 H. Williams and C. Meyers, Oil and Gas Law § 203.1 at 34 (1988); Farnell, supra, 33 Ala.L.Rev. at 523.[11] The owner of property containing gas has the right to reduce the gas to possession or to sever the gas rights by conveyance. The nonownership theory of gas ownership, because it recognizes the migratory nature of oil and gas, requires actual possession to establish ownership of the resource, and the right held by the landowner is "the right to reduce the oil and gas to possession or to sever this right for economic consideration." Id.
The majority of states follows the "ownership-in-place" theory of ownership of natural gas. Under this theory, "gas and oil in place are minerals and realty, subject to ownership, severance, and sale, while embedded in the sands or rocks beneath the earth's surface, in like manner and to the same extent as is coal or any other solid mineral." Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 167, 254 S.W. 290, 292 (1923). Thus, in ownership-in-place states, such as Pennsylvania, "the owner of a tract of land holds the fee in oil and gas underlying the boundaries of his property even though the oil and gas are not the subject of actual possession until brought to the surface." Farnell, supra, at 522.
However, the issue here is who has the right to recover coalbed methane gas. "While the distinction between `ownership [in place]' and `non-ownership' of oil and gas may have significant implications in other contexts, it does not affect the extent of extraction rights." Lewin et al., supra, at 619.
Coal, like gas, is a part of the land; it is, like gas, a part of the realty, subject to ownership, severance, and sale. Conveyance of coal as a distinct property also includes that bundle of property rights included within the coal, such as the rights incident and necessary to the recovery of the coal. Williams v. Gibson, 84 Ala. 228, 232-34, 4 So. 350 at 353-54 (1888). This bundle of property rights includes the right to reduce *224 to possession any gas trapped within the coal itself, so long as that gas remains within the coal until the time of its capture. However, as shown below, due to the migratory nature of natural gas, the coal owner would lose any right to possess coalbed methane gas once that gas migrates out of his property and thus beyond his right to reduce the gas to possession.
Subterranean gas is fugacious and migratory. NCNB, on behalf of the gas owners, argues that, under the rule of capture, gob gas collected from noncoal strata belongs to the owners of gas in that strata. The appellee coal owners counter that the rule of capture applies only to horizontal migration of oil and natural gas, and not to vertical migration of gas between strata. The coal owners further contend, and by its ruling the trial court seems to have agreed, that coalbed gas belongs to the owner of the stratum in which the gas originated, i.e., to the coal owner, regardless of the later migration of that gas to other, noncoal strata. This reasoning, whereby ownership of gas depends on its point of origin rather than on its point of capture, does not comport with the law governing the ownership and possession of migratory resources such as gas and oil.
Under the rule of capture, gas that migrates from one property to another is subject to recovery and possession by the holder of the gas estate on the property to which the gas migrates. The rule has been stated as follows:
"The owner of a tract of land acquires title to the oil and gas which he produces from wells drilled thereon, though it may be proved that part of such oil and gas migrated from adjoining lands."
Hardwicke, The Rule of Capture and Its Implications as Applied to Oil and Gas, 13 Tex.L.Rev. 391, 393 (1935). Strictly speaking, the rule of capture evolved to settle disputes between oil and gas owners on separate tracts of land with mutual access to the same pool or source of oil or gas. Under this rule, "absent negligence, waste, or fraud, the owners of oil and gas rights have no protection against drainage resulting from vertical drilling on adjacent tracts, but under the rule of `go and do likewise' they are not liable if their activities drain oil or gas from adjacent tracts." Lewin et al., supra, at 619 n. 256. The rule, thus, applies to vertical drilling on different tracts of land within the same oil or gas field; it is not meant to allow "competition among holders of different mineral interests within a single tract." Id. at 619. The rule settles disputes over title to migratory mineral resources such as gas and oil. This rule applies to coalbed methane gas, a migratory mineral resource. Thus, so long as the coalbed gas is bound within the coal seam in which it originated, the holder of the coal estate has the right to extract the gas and reduce it to possession. However, once the coalbed gas migrates out of the stratum in which it originated, the right to recover the gas belongs to the holder of the gas estate.[12]
The Hoge court addressed this issue as follows:[13]
"The fact that gas is of a fugacious character does not prevent ownership in it from being granted prior to its being reduced to possession. We have long recognized that gas may be owned prior to being recovered from its natural underground habitat. Gas is a mineral, though not commonly spoken of as such, and while in place it is part of the property in which it is contained, as is the case with other minerals within the bounds of a freehold estate. Gas necessarily belongs to the owner in fee, so long as it remains part of the property; ownership in it will be lost *225 only upon grant or upon the gas leaving the property through migration....
"Thus, as a general rule, subterranean gas is owned by whoever has title to the property in which the gas is resting. Cf. Kier v. Peterson, 41 Pa. 357 (1862) (owner of subterranean salt entitled to oil commingled with it). But cf. Erwin's Appeal, 7 Sad. 477, 12 A. 149 (Pa.1887). When a landowner conveys a portion of his property, in this instance coal, to another, it cannot thereafter be said that the property conveyed remains as part of the former's land, since title to the severed property rests solely in the grantee. In accordance with the foregoing principles governing gas ownership, therefore, such gas as is present in the coal must necessarily belong to the owner of the coal, so long as it remains within his property and subject to his exclusive dominion and control. The landowner, of course, has title to the property surrounding the coal, and owns such of the coalbed gas as migrates into the surrounding property."
United States Steel Corp. v. Hoge, 503 Pa. 140, 147, 468 A.2d 1380, 1383 (1983) (some citations omitted) (emphasis original).
Only four cases, including Vines, involve issues raised by the creation of separate estates in coal and coalbed methane gas. Vines v. McKenzie Methane Corp.; United States Steel Corp. v. Hoge; Rayburn v. USX Corp., No. 85-G-2261-W, July 28, 1987 (N.D.Ala.), affirmed, 844 F.2d 796 (11th Cir. 1988); and Carbon County v. Baird, (Ms. No. Dv-90-120, 1992 WL 464786, Dec. 14, 1992, Thirteenth Judicial Circuit, Carbon County, Montana). Although we reviewed the other three cases in Vines, that case did not involve the reservation of gas. The deeds in Vines had no language indicating whether the owner of the coal had rights to coalbed methane, or any other gas, or the accompanying rights to produce and market methane gas. See Vines, at 1309. Therefore, our review of these cases in Vines was not made in light of an analysis of whether a reservation of "gas" includes coalbed methane, and we will now reexamine these cases in that light.[14]
The trial court relied heavily on the Hoge decision in concluding that, as a matter of law, coalbed methane gas is a part of the coal estate. In Hoge, United States Steel Corporation, pursuant to a 1920 deed, owned rights to "all the coal" and "all the rights and privileges necessary and useful in the mining and removing of said coal, including ... the right of ventilation." 503 Pa. at 144, 468 A.2d at 1382. Hoge reserved "the right to drill and operate through said coal for oil and gas without being held liable for any damages." Id. The Pennsylvania Supreme Court wrote:
"[A]s a general rule, subterranean gas is owned by whoever has title to the property in which the gas is resting.... [T]herefore, such gas as is present in the coal must necessarily belong to the owner of the coal, so long as it remains within his property and subject to his exclusive dominion and control. The landowner, of course, has title to the property surrounding the coal, and owns such of the coalbed gas as migrates into the surrounding property."
503 Pa. at 147, 468 A.2d at 1383 (emphasis added). The court then considered "the plain meaning, in the common understanding, of the provisions" of the deed, and considered its language "in its entirety, giving effect to all its terms and provisions, and construing the language in light of conditions existing at the time of its execution." 503 Pa. at 149, 468 A.2d at 1384. The court stated:
"[A]t the time this coal severance deed was entered into, although commercial exploitation of coalbed gas was known such operations were very limited and sporadic. Indeed for the most part coalbed gas was a dangerous waste product which had to be vented from the coal seam to allow for safe mining of the coal....
".... Although the unrestricted term `gas' was used in the reservation clause, in *226 light of the conditions existing at the time of its execution we find it inconceivable that the parties intended a reservation of all types of gas.... We find implicit in the reservation of the right to drill through the severed coal seam for `oil and gas' a recognition of the parties that the gas was that which was commercially exploitable. It strains credulity to think that the grantor intended to reserve the right to a valueless waste product.... We find more logical and reasonable the interpretation ... that the reservation intended only a right to drill through the seam to reach the unconveyed oil and natural gas generally found in strata deeper than the coal."
503 Pa. at 149-50, 468 A.2d at 1384-85. Thus, although the court recognized that coalbed methane was commercially, although not commonly, exploited in 1920, and implied that the reservation was only for commercially exploitable gas, it found that coalbed methane gas was not included in the reservation of gas.[15] This conclusion must be based, at least in part, on the language in the reservation clause stating that the grantor "retained the right to drill and operate through said coal for oil and gas." Because Davant unambiguously reserved the right to "all gas," and not just to the gas obtained by drilling through the coal he conveyed to Center Coal, and because the Hoge court was compelled to find the parties' intent through interpretation of the facts and circumstances existing when they executed the deed, the rationale of Hoge is distinguishable.
We find certain language in the Hoge dissent to be compelling:
"Given their awareness of the presence of coalbed gas in the stratum, the earlier described similarities between coalbed gas and what has commonly been referred to as `natural gas', and the fact that the unrestricted term `gas' was employed in the reservation clause, we believe the plain meaning of the term `gas' would be too far subverted were we to exclude coalbed gas as a recoverable gas."
503 Pa. at 158, 468 A.2d at 1389 (Flaherty, J., dissenting).[16]
The other two cases involving coalbed methane are likewise distinguishable. In Rayburn v. USX Corp., supra, a case involving a 1960 deed conveying "the minerals and mining rights, except oil and gas and the right to explore for and remove the same," the court expressly declined to consider whether methane gas was included in the term "gas" or was severed with the mineral coal, instead relying exclusively on the language of the instrument to determine that coalbed methane gas was included in the coal estate. The Rayburn court stated:
"The language of the contracting document is clear and unambiguous. The reservation of oil and gas exploration `shall be subject to the requirement that all coal seams located in said lands penetrated in such exploration or drilling operations shall be encased or grouted off....'
"....
"... The clearly expressed intention is that the methane in the coal bed not be available to any well drilled by the grantors who reserved the `oil and gas' or to their assigns."
Therefore, Rayburn does not specifically address the issue of whether coalbed methane belongs to the holder of coal rights or to the holder of gas rights.
Carbon County, an unpublished Montana trial court case, involved a dispute by separate owners of the coal rights and the gas rights on the same property. That case was unlike the one before us in that the 1974 conveyance of coal rights in that case did not involve a reservation of gas. The later conveyance in 1990 of gas and oil rights, specifically including "coal seam methane," led to predictable conflicts between ongoing coal *227 mining operations and the recovery of coalbed methane gas by the owner of the gas rights, who drilled into the coal beds to recover the methane contained therein. The court noted the inevitable interaction and potential conflicts between coal mining and gas extraction, see Vines, supra, 619 So.2d at 1308, and concluded that recovery of these natural resources would be more efficient when a single entity held the rights to coal and to coalbed methane. See Vines, supra, at 1308 ("the processes of drilling for coalbed methane gas and mining for coal are inextricably intertwined"). The Carbon County court, apparently addressing the issue as one of "quasi public character," held that as a matter of law the rights to coalbed methane gas could not be separated from the coal rights, and that, therefore, the holder of oil and gas rights did not hold rights to coalbed methane gas, notwithstanding the express language of the deed that purported to grant rights to coalbed methane gas along with the gas estate.
The court, in reaching its holding, depended heavily on the fact that methane gas must be ventilated and reduced to safe levels before any coal can be mined and relied on state law indicating that a grant of coal rights is presumed to grant whatever is essential to its use. The court also relied on the Hoge case for the proposition that "the owner of the coal necessarily owns the gas found therein" and found that proposition consistent with Montana law.[17] Because methane gas is essential to the use, i.e., mining, of coal, and because the miner must vent the gas before mining coal, and because the coal is the source and the reservoir of coalbed methane gas, the court concluded that the conveyance of "coal and coal rights" included, as a matter of law, all of the coalbed methane gas located within the coal seams. Most importantly, the Carbon County court did not address the issue of who owns the gas once it migrates from the coal seam into the strata above, because the proposed recovery of coalbed methane in that case was by vertical wells drilled by the gas lessee before any coal mining had occurred in the area.
We disagree with Carbon County insofar as it treats the coal miner's qualified right to ventilate dangerous methane gas as if it were an absolute right of ownership. As we have observed, it is not disputed in the scientific and legal communities that coalbed methane gas constitutes a separate and severable interest in land that cannot be taken against the will of the owner without just compensation.[18]
The question before us is who owns the rights to coalbed methane gas under the Davant deeds, and not who should own those rights. It is not the role of this Court to disturb existing property rights by redefining existing property law in order to promote economic efficiency. The common law is flexible and can, within the bounds of stare decisis, be molded to protect the established legal rights of individuals as new and untested situations arise. As the Supreme Court of Pennsylvania stated over a century ago:
"The discovery of new sources of wealth, and the springing up of new industries which were never dreamed of half a century ago, sometimes present questions to which it is difficult to apply the law, as it has heretofore existed. It is the crowning merit of the common law, however, that it *228 is not composed of ironclad rules, but may be modified to a reasonable extent to meet new questions as they arise. This may be called the `expansive property of the common law.' Mining rights are peculiar, and exist from necessity, and the necessity must be recognized, and the rights of the mine and land owners adjusted and protected accordingly."
Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 294-95, 25 A. 597, 598 (1893).
The appellee coal owners argue that coalbed methane gas should receive different legal treatment from other natural gas. We find no basis in law or science for a different treatment. The appellee coal owners also contend that the rule of capture applies solely to oil and natural gas and does not apply to migration of coalbed methane gas. Therefore, they contend, the holder of the gas estate would have no right to recovery of coalbed gas within the gob zone. We cannot agree. There is no scientific or technical basis to treat coalbed methane gas as a different resource from other natural gas. There is likewise no compelling reason why coalbed methane gas should receive a different legal treatment from other gas, merely because coalbed gas originates within coal. Because coalbed methane gas is essentially identical to, and migrates in the same manner as, other natural gas, there is no reason why the rule of capture and the laws governing ownership of migratory natural gas should not apply to coalbed methane gas as well.[19]
The appellee coal owners are understandably concerned that, if NCNB is found to have exclusive rights to gas production, then such rights would interfere with the coal owners' efficient production of coal. However, NCNB concedes that "any production of gas from the coal would be subject to the correlative rights of the owners of the coal estate to mine their coal safely and without undue interference." Appellant's Brief at 38. Although some conflict is in most cases inevitable, such conflicts have long existed in other contexts when the original owner grants separate rights to various parties for the recovery of different resources from the same tract of land. See Lewin et al., 94 W.Va.L.Rev. at 592-93 & n. 131 (noting conflicts between coal industry and oil and gas industry). For example, separate owners of timber, coal, and petroleum on the same tract of land historically have had to make certain concessions to each other's recovery operations. The laws regulating such land use conflicts are well established. Id. at 623-24.
Coalbed methane gas is toxic and highly explosive and poses a hazard to miners and to mining operations. Vines, supra, at 1307. Federal and state laws require the mine operator to control the rate of methane seepage into occupied areas during the mining process. 30 U.S.C. §§ 863, 877(h) (1988); 30 C.F.R. § 75.301-330 (1991); § 25-9-82(b), Ala.Code 1975 (1992). The grant of coal mining rights would be useless if it did not include the right to ventilate methane gas from the coal mining area, pursuant to the requirements of the law.
"The principle is well settled that one who has the exclusive right to mine coal upon a tract of land has the right of possession even as against the owner of the soil, so far as is necessary to carry on his mining operations. To construe away this right would be to construe away the grant itself, which can not be enjoyed without it.
"....
"These incidental rights of the miner, which are appurtenant to the grant of the mineral rights, are to be gauged by the necessities of the particular case, and, therefore, vary with changed conditions and circumstances."
Williams v. Gibson, 84 Ala. 228, 232-34, 4 So. 350 at 353-54 (1888) (emphasis original). At the time of the initial conveyance to Center Coal in 1953, the Alabama Coal Mine *229 Safety Act of 1949 required ventilation of methane from coal mines. Act No. 49-207, 1949 Ala.Acts 242 (now codified at § 25-9-82). This requirement must be read into the grant of coal and the reservation of gas in the 1953 deed. Barber Pure Milk Co. of Montgomery v. Alabama State Milk Control Bd., 275 Ala. 489, 494, 156 So.2d 351, 355 (1963) (contracts are made with reference to existing law).
The grant of all the coal and mining rights includes a grant of those rights incident to, and necessary to, the mining of the coal, which include the qualified right to properly ventilate existing or proposed coal mining operations. The rights to "all gas" reserved by the grantor cannot, therefore, impair coal mining operations. To the extent that ventilation is required by law, the coal owner will not be liable to the owner of gas rights for any waste of methane gas that occurs during ventilation. The appellant gas owners do not dispute this point.
We hold that the appellant gas owners have no interest in coalbed gas recovered from horizontal or vertical wells drilled directly into coalbeds before the coal is mined, although the gas owners do have a 22½% interest in coalbed gas that migrates out of the coal seams, such as that gas collected within the gob zone.
For the above reasons, we hold that, absent a clear showing to the contrary, the reservation of all gas includes the right to coalbed methane gas that migrates into other strata from out of the source coal beds where it formed. We further hold that, based on the facts and circumstances of each case, and absent a clear showing of the parties' intent to the contrary, the reservation of coalbed methane gas does not include coalbed gas contained within its source coal seam, and that the holder of the coal estate has the right to recover in situ such gas as may be found within the coal seam. However, once that gas escapes unrecovered from the coal and migrates into other strata, then the holder of the gas estate has the right to reduce to possession the coalbed methane gas from the other strata. If the coal owner captures and sells gob gasses that have migrated into other strata, the gas owners are entitled to share in any profits on such sales, after taking into account the cost borne by the coal owner in capturing and marketing the gas.
Therefore, we affirm that part of the judgment holding that the appellee coal owners/lessees have the exclusive right to produce and own coalbed methane gas from horizontal boreholes and vertical degasification wells drilled directly into the source coal seam. Because the right to recover coalbed gas from the gob area above the source coalbed properly belongs to the gas estate, however, we reverse that part of the trial court's judgment holding that the appellee coal owners/lessees have the exclusive right to produce and own all of the coalbed methane gas that has been, or that will be, produced from gob wells on the Property.
Because our holding raises factual and legal issues that must be determined by the trial court, we remand the case for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and ADAMS, HOUSTON, STEAGALL and INGRAM, JJ., concur.
MADDOX, J., concurs in part and dissents in part.
MADDOX, Justice (concurring in part; dissenting in part).
I believe that the trial court's judgment should be affirmed; consequently, I cannot agree with the majority's reversal of a portion of that judgment and the majority's remand to the trial court.
The subject deed was executed in 1953. The trial judge, after a 10-day trial, entered a lengthy order and judgment, which is quoted in the majority opinion. I believe that he reached the right result.
This Court, in Nettles v. Lichtman, 228 Ala. 52, 152 So. 450, 452, 91 A.L.R. 1455 (1934), said:
"And it is the well-settled rule that, where the language of a deed is ambiguous, the intention of the parties may be ascertained by a consideration of the surrounding circumstances *230 existing at the time of its execution, and for this purpose the court will place itself as nearly as possible in the position of the parties when the instrument was executed. 18 Corpus Juris, p. 260. To ascertain the intent in respect to the property conveyed, reference may be had to the state of facts as they existed when the instrument was made, and to which the parties may be presumed to have had reference. 18 Corpus Juris, 280. Of course the entire instrument is to be considered, and, if it can be reasonably done, and not inconsistent with the general intent of the whole instrument, effect and meaning should be given to every clause, word, and expression, so that the deed may operate according to the intention of the parties. 18 Corpus Juris, 258. These general rules were here recognized in the recent case of Walker v. Smith Lumber Co., 226 Ala. 65, 145 So. 572, 574, where it was said: `Deeds of bargain and sale * * * for a valuable consideration are to be construed most strongly against the grantor and in favor of the grantee, and, of course, in the matter of construction it is the duty of the court to look at the whole conveyance, the circumstances under which the contract was made, the relative position of the parties, and the purpose and object designed to be accomplished. The intention of the parties to the instrument, when clearly ascertained, is of controlling efficacy.'"
228 Ala. at 54-55, 152 So. at 452. (Quoted with approval in Hart v. Baptist Foundation of Alabama, 264 Ala. 632, 632, 88 So.2d 681, 681 (1956)).
The Court, in Hart, after quoting Nettles, stated, "The lower court, as do we, was seeking to ascertain the purpose, object and intention of the parties and `"... for this purpose the court will place itself as nearly as possible in the position of the parties when the instrument was executed ...."' Williams v. Johns-Carroll Lumber Co., 238 Ala. 536, 192 So. 278, 280 [1939]; 26 C.J.S., Deeds, § 92, p. 344." 264 Ala. at 635-36, 88 So.2d at 684. (Emphasis added.)
Placing myself as nearly as possible in the position of the parties when the subject deed was executed, and applying the rule of construction that "[d]eeds of bargain and sale... for a valuable consideration are to be construed most strongly against the grantor and in favor of the grantee," Nettles, supra, I believe that, in 1953, the grantor did not intend to reserve coalbed methane gas. It is my opinion that when this conveyance was executed the word "gas," appearing in the reservation clause, was considered to mean the type of gas defined and regulated by the provisions of what are now §§ 9-17-1 through 9-17-110, Ala.Code 1975. The provisions of § 9-17-1, which were applicable at the time the subject deed was executed, defined "oil" and "gas," two of the terms used in the reservation clause, as follows:
"§ 9-17-1. Definitions.
"Unless the context otherwise requires, the words defined in this section shall have the following meanings when found in this article:
"....
"(3) Oil. Crude petroleum oil and other hydrocarbons, regardless of gravity, which are produced at the well in liquid form by ordinary production methods and which are not the result of a condensation of gas after it leaves the pool.
"(4) Gas. All natural gas, including casinghead gas, and all other hydrocarbons not defined as oil in subdivision (3) of this section.
"(5) Pool. An underground reservoir containing a common accumulation of crude petroleum oil or natural gas or both and each zone of a general structure which is completely separated from any other zone in the structure.
"(6) Field. The general area which is underlaid or appears to be underlaid by at least one pool, and such term shall include the underground reservoir or reservoirs containing crude petroleum oil or natural gas or both. The words `field' and `pool' mean the same thing when only one underground reservoir is involved; however, the word `field,' unlike the word `pool,' may relate to two or more pools."
Even though the definition of "gas" in the 1945 statute codified at § 9-17-1 is broad enough to include coalbed methane gas, the *231 subject of this controversy, I cannot believe that the Legislature, at the time of the execution of the subject deed, intended the term "gas" to refer to coalbed methane gas, because methane gas was considered to be a hazard at that time. In fact, in 1949, the Legislature had adopted an Act "to provide for the safety and health of persons engaged in, and to protect property used about the mining of coal," and that act specifically required the ventilation of methane, rather than its conservation.[20]
When coalbed methane gas became marketable, disputes over the rights to coalbed methane became more prevalent,[21] and the Legislature, in 1990, found that "coalbed methane gas wells are an important source of natural gas for use in industry and by consumers thereof in Alabama and are becoming increasingly common in Alabama as the technology for such wells advances."[22]
The majority concludes that the language of this instrument creates rights different from those discussed by the Court in Vines v. McKenzie Methane Corp., 619 So.2d 1305 (Ala.1993). I cannot agree with that conclusion. Even though I recognize that the language of the granting clause involved in this case, which reads "all the coal and mining rights," is not the same as "all of the coal, iron ore, and other minerals, in, under, and upon" the property, the language used in the conveyances in Vines, the principles of law applicable to the construction of deeds, and to ascertaining the intent of the parties, is the same. In Vines, this Court, following United States Steel Corp. v. Hoge, 503 Pa. 140, 468 A.2d 1380 (1983), wrote:
"Because drilling coalbed methane gas has only recently become a profitable business, there are few cases addressing the issue of whether that gas is necessarily *232 included within the lease of an interest in coal. The first case to address the issue was United States Steel Corp. v. Hoge, 503 Pa. 140, 468 A.2d 1380 (1983). United States Steel Corporation owned `all of the coal' contained in certain tracts of land owned by the individual defendant, Hoge, as well as `all the rights and privileges necessary and useful in the mining and removing of said coal, including ... the right of ventilation.' 503 Pa. at 144, 468 A.2d at 1382. Hoge retained the `right to drill and operate through said coal for oil and gas without being held liable for any damages.' Id. After considering the nature of methane gas, the Pennsylvania Supreme Court held that the gas as it is present in coal intrinsically belongs to the owner of the coalbed, so long as it remains part of the coalbed, and that ownership would be lost only upon a grant of rights or when the gas left the coalbed through the process of migration. In determining that coalbed methane gas was included in the grant of rights contained in the 1920 deed, the court ascertained the intent of the parties according to the following rationale:
"`[A]t the time this coal severance deed was entered into, although commercial exploitation of coalbed gas was known such operations were very limited and sporadic. Indeed for the most part coalbed gas was a dangerous waste product which had to be vented from the coal seam to allow for safe mining of the coal....
"`The reservation to the grantor of the right to drill through the coal seam deeded away for oil and gas is stated generally. Although the unrestricted term `gas' was used in the reservation clause, in light of the conditions existing at the time of its execution we find it inconceivable that the parties intended a reservation of all types of gas. In so finding, we are unable to overlook a basic question: Why would a party retain the right to something which is only a waste product with well-known dangerous propensities? ... It strains credulity to think that the grantor intended to reserve the right to extract a valueless waste product with the attendant potential responsibility for damages resulting from its dangerous nature.'"
619 So.2d at 1307-08. In Vines, this Court, using the Hoge Court's rationale, concluded, as the Hoge Court did, that "`subterranean gas is owned by whoever has title to the property in which the gas is resting'" and that the title holder "`may mine his coal, extract the gas from it, or both.' Hoge, 503 Pa. at 147, 468 A.2d at 1384." 619 So.2d at 1308.
It is my opinion that, at the time of the execution of the subject conveyance, coalbed methane gas was considered to be a part of the coal, and "[a]lthough the unrestricted term `gas' was used in the reservation clause, in light of the conditions existing at the time of its execution [I] find it inconceivable that the parties intended a reservation of all types of gas." Vines, supra, at 1308, quoting from Hoge.
Like the Hoge court, I ask: "Why would a party retain the right to something which is only a waste product with well-known dangerous propensities? ... It strains credulity to think that the grantor intended to reserve the right to extract a valueless waste product with the attendant potential responsibility for damages resulting from its dangerous nature." (As quoted in Vines, at 1308.) I ask a further question: Why would the grantor, in 1953, retain the right to methane gas and be responsible for its ventilation and the filing of reports, etc., as required by law? I think the learned trial judge was correct. I would affirm.
NOTES
[1] Although the briefs on appeal mention only the 1953 deed, the trial court's order addresses deeds from 1953 and 1954. The language of the deeds is substantially the same except for the property descriptions, and the language granting coal and coal mining rights and reserving gas rights is identical in both deeds. See December 31, 1992, order of the trial court, infra, at para. 7. Therefore, although we primarily refer to the 1953 deed throughout this opinion, our analysis and conclusions of law apply to the 1954 deed as well.
[2] Coalbed methane gas is also referred to as coalbed gas, coalbed methane, coal seam gas, occluded coalbed methane gas, and firedamp, and it is referred to by a variety of similar terms. Jeff L. Lewin et al., Unlocking the Fire: A Proposal for Judicial or Legislative Determination of the Ownership of Coalbed Methane, 94 W.Va.L.Rev. 563, 566-67 (1992).

Coalbed methane gas is formed within coal seams as a by-product of the process by which peat turns into coal. See Sarah Kathryn Farnell, Methane Gas Ownership: A Proposed Solution for Alabama, 33 Ala.L.Rev. 521 at 521 (1982); Harry Cohen, Legal Issues Involved in Producing Coal Bed Methane Gas, 42 Ala.Lawyer 660 at n. 2 (1981). The gas is not part of the molecular structure of the coal, but is adsorbed onto the surface of the coal. Thus, the coal acts as a reservoir for the gas, although some of the gas naturally migrates into the surrounding rock strata during the coal-forming process. Vines v. McKenzie Methane Corp., 619 So.2d 1305, 1306-07 (Ala.1993). "As the coal is mined [or otherwise fractured], the draining of water out of the cracks of the coal and the stresses placed on the coal cause increasing quantities of the methane to become free from the coal and to accumulate in the mining area" and in the fractures and pore space of overlying strata. Id., at 1307.
[3] This 40-acre tract is part of the Brookwood coal field.
[4] NCNB argued at trial that some of the gas produced was not coalbed methane gas, but was natural gas contained in non-coal strata. Title to this gas would have been reserved by the grantor, Phil Davant, in the deeds to Center Coal Company; therefore, NCNB as trustee would hold an undivided 22½% interest in the non-coalbed gas even if the deeds did transfer title to the coalbed methane gas to the holders of the coal and coal mining rights.
[5] Evidence at trial indicated that gob well production represented 70% of the commercial methane gas captured from the Brookwood coal field. The Brookwood field produced 100,000 cubic feet of methane a day, of which 30,000 cubic feet a day were captured for market.
[6] The trial court also severed Black Warrior Transmission Company for a separate trial on issues concerning quieting title. C.R. 1097-98.
[7] The solicitor general of the United States, in an opinion concerning ownership of coalbed methane gas on federal lands, has stated, "Coalbed methane is both scientifically defined and legally regarded as a gas." M-36935, 88 Interior Dec. 538, 540 (1981), quoted in Lewin et al., supra, at 621 & n. 267.
[8] We find little guidance from analogous incidences where two distinct mineral resources are intermingled within the same reservoir or host stratum. For instance, coalbed gas is analogous to oil shale, in that the oil shale acts as a reservoir for the oil, which must be extracted from the shale to become a useful resource. However, the case law on whether a reservation of oil and gas includes the oil within oil shale is inconclusive. See Lewin et al., supra, at 623. Brennan v. Udall, 379 F.2d 803 (10th Cir.), cert. denied, 389 U.S. 975, 88 S.Ct. 477, 19 L.Ed.2d 468 (1967), relying on a federal statute that required construction of ambiguities in favor of the Government, found that oil shale was included in the Government's reservation of oil and gas. On the other hand, Bell Petroleum Co. v. Cross V Cattle Co., 492 P.2d 80 (Colo.Ct.App.1971), construing any ambiguities against the grantor of a deed, held that oil shale was not included in a reservation of oil and gas. Because the reservation of "all gas" is not ambiguous, we may not rely on arbitrary rules of construction in determining who owns the coalbed methane gas.

Other cases involving intermingled mineral resources are equally uninstructive. See Farnell, Methane Gas Ownership: A Proposed Solution for Alabama, supra, at 528-29. For example, instances of uranium found with lignite coal or sodium found with potash occurred on public lands in the western United States, and removal of these resources was controlled by federal legislation. Id. Congress left to the local courts resolution of disputes between lessees of the coal and those with rights to the uranium. Id.; see H.R.Rep. No. 1478, 84th Cong., 1st Sess. 6 (1955).
[9] The United States solicitor general has indicated that in the conveyance of federal lands, coalbed methane gas is included within a reservation of oil and gas but is not included within a reservation of coal. M-36935, 88 Interior Dec. 538 at 540, 549 (1981), cited in Lewin et al., supra, at 621.
[10] Turner involved a conveyance of land "LESS AND EXCEPT all oil, gas, and minerals." 484 So.2d at 379. The meaning of "oil, gas, and minerals" was not an issue in that case, where we found that the deed "was not ambiguous and clearly excepted all oil, gas, and minerals." Id. at 380.
[11] Williams and Meyers state that there is no clear adherence to the nonownership theory in Alabama, and that the exact nature of a landowner's interest in oil and gas may be an unresolved issue. Williams and Meyers, supra, at 34, citing Moorer v. Bethlehem Baptist Church, 272 Ala. 259, 263-65, 130 So.2d 367 (1961).
[12] The coal owner's rights to extract coalbed gas derive from the fact that the gas originates in, and is stored in, the coal seam from which the gas is directly recovered by the use of horizontal wells and vertical degasification wells. These rights are lost when the gas migrates out of the coal seam.
[13] Although Hoge is a Pennsylvania decision and thus applies principles of the ownership-in-place theory of gas ownership, its reasoning is still applicable to extraction conflicts in Alabama, because even in an ownership-in-place state, rights to oil and gas are lost when these resources migrate onto another's property and are there recovered. One must, however, bear in mind that it is not the gas that is owned in Alabama, but the right to reduce the gas to possession, and the analysis of Hoge must be applied with this distinction.
[14] We note that the result in some of these cases relied on the intent of the parties and the language of the instruments purporting to sever coal and gas rights. Although we address the issue before us as one of property law because the language of the Davant deed is unambiguous and the intent of the parties is clear from the face of the deed, a review of these cases should still prove useful to a comprehensive understanding of the issues raised by this appeal.
[15] One could also argue that it would be incredible that the purchaser of the coal rights intended to purchase the right to a valueless waste product. Several scholars have indicated that "if [coalbed methane] is a natural gas, and the parties generally intended a conveyance of all natural gas, then the specific intent of the parties with respect to [coalbed methane] may be irrelevant." Lewin et al., supra, at 624 & n. 286.
[16] Justice Flaherty's dissent was originally prepared as a proposed majority opinion and was submitted for publication as a dissent when it failed to receive sufficient votes.
[17] The court noted that Montana, like Pennsylvania, is an "ownership-in-place" state with regard to natural gas.
[18] Ownership of coalbed methane gas is slowly being addressed by state legislatures. Recovery of coalbed gas is in the public interest, because methane gas is an important energy resource, and because authorities within the field concede that its ventilation into the atmosphere contributes to global warming. See Lewin et al., supra, at 584-92 and sources cited therein.

However, when the ownership of gas rights and the ownership of coal rights have been severed between two or more parties, then the incentives to recover coalbed gas are hindered by questions of who owns the coalbed methane gas. If legislative solutions determining ownership on public policy grounds are retroactively applied, then such legislation may be unconstitutional if it affects a taking of property (rights to coalbed gas) without just compensation or without due process of law. Several legal scholars have addressed possible legislative solutions to the ownership of coalbed gas and the problems with the constitutionality of certain solutions. See, e.g., Lewin et al., Farnell, and Cohen, all cited in note 2.
[19] The jury in this case determined that none of the gas already recovered from the Property by the appellees was natural gas other than coalbed methane gas. However, it is likely that a situation could arise wherein both coalbed gas and natural gas from a source other than coal could migrate to and commingle within the same reservoir. In such a situation it would be impossible to contend that the rule of capture and the laws relating to ownership of migratory gas would apply to the gas from one source rock without equally applying to the gas from another.
[20] Act No. 207, Ala.Acts 1949, p. 242 et seq., required reports as to ventilation, gas content, reopening of mines, etc.:

"Section 20. Reports to Division.
"(a) The operator of each coal mine classed as gassy shall send to the Division a report monthly, or more often if necessary, showing the amount of ventilation and methane content at the inlet and outlet, the amount of ventilation and the methane content of return air at or near the last crosscut in each working entry, the number of splits and the number of men and animals on each split and the places gas has been detected in old workings. The report shall include a record of the pressure gauge readings at the fan.
"(b) All of above provisions apply to non-gassy mines except methane content requirements.
"(c) A prompt report, by the quickest available means, must be made by the operator to the Division upon detection of any dangerous accumulation of methane in any coal mine, whether accompanied by explosion or not. This report shall state precautions taken to safeguard employees and action taken or planned to remove the dangerous accumulation. The Division will issue such supplementary orders as may be indicated and dispatch one or more inspectors promptly to the mine if the circumstances warrant.
"(d) A report shall be made by the operator to the Division prior to opening any new or reopening any abandoned coal mine or abandoning any coal mine.
"(e) A report shall be made by the operator to the division when the workings of any coal mine are approaching an abandoned coal mine, shaft or other underground passages that are known to contain or may contain dangerous accumulations of water or gas."
[21] See, Vines v. McKenzie Methane Corp., 619 So.2d 1305 (Ala.1993), for a discussion of this development.
[22] In Ala.Code 1975, § 9-17-130, the Legislature made the following findings and declaration:

"The legislature of the state of Alabama finds and declares that the protection of Alabama's environment is vital to the economy of this state; that coalbed methane gas wells are an important source of natural gas for use in industry and by consumers thereof in Alabama and are becoming increasingly common in Alabama as the technology for such wells advances; that the broadest possible promotion of public and private interests requires that coalbed methane gas wells be properly plugged when abandoned; that delays therein may affect the environment or public health, safety and welfare; that adequate financial resources be readily available to provide for the expeditious plugging of such wells and to provide a means for doing so without delay; that the legislature has heretofore authorized the state oil and gas board of Alabama to require that operators of such wells provide evidence of financial responsibility to cover the costs of plugging such wells; that performance bonds so required and obtained for such purpose may not be adequate in amount or even obtainable in the present insurance market; and that the health, safety, and welfare of the citizens of the state of Alabama will be enhanced and protected by the provisions of this article."
Ala.Acts 1990, Act No. 90-635, p. 1164, § 1.