**In re HILLSBOROUGH HOLDINGS CORPORATION, et al., Debtor.**

Bankruptcy Nos. 89–9715–8P1 through 89–9746–8P1.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 28, 1997.

Don M. Stichter, Tampa, FL, for Debtors.

Conrad P. Armbrecht, Mobile, AL, Special Counsel for Debtors.

Fred Hagans, Houston, TX, James P. Paul, Miami, FL, Douglas S. Draper, New Orleans, LA, Larry A. Reed, St. Louis, MO, for CTC Materials.

### ORDER ON DEBTORS' OBJECTIONS TO CLAIM NOS. 117 and 580 FILED BY CTC MINERALS, INC.

ALEXANDER L. PASKAY, Chief Judge.

THESE ARE confirmed Chapter 11 cases and the matters under consideration are the Objections filed by Debtors, Jim Walter Resources, Inc. (Resources) and United Land Corporation (United Land) (hereinafter collectively referred to as the "Debtors") to Proof of Claim No. 117 filed by CTC Minerals, Inc. (CTC) against United Land and Proof of Claim No. 580 filed by CTC against

Resources. Claim Nos. 117 and 580 both assert unliquidated, unsecured claims for damages. Although it appears from the face of the proofs of claim that CTC is seeking general unsecured claims, at trial this Court determined that CTC's claims would be treated as applications for the allowance of administrative expenses. (Transcript of final evidentiary hearing held on October 24–25, 1996, hereinafter referred to as "T-___", pp. 17–20).

It is CTC's contention that it holds a 22½ percent ownership interest in the oil and gas extracted from a 3,800 acre tract of land (hereinafter referred to as the "Property").

The stated basis for CTC's claims is Resources' and United Land's alleged conversion of coalbed methane gas during the period of 1987 through December 9, 1994. The Debtors deny their indebtedness to CTC in any amount and deny having converted any of CTC's property. The facts relevant to the resolution of this controversy as they appear in the record are as follows:

The Property is part of the Brookwood Field, a coal mining and coal degasification field located in Tuscaloosa County, Alabama. (T–434). A 45 percent interest in the minerals underlying the Property was owned in the early 1950's by Phil Davant. (Debtor's Exhibits 1 and 3, CTC Exhibit 21). In 1953 and 1954, Davant conveyed his 45 percent ownership interest in the coal and mining rights to Center Coal Company ("Center Coal") but specifically reserved to himself, his interest in "all of the oil, gas, petroleum, and sulphur ..." (T–314–315, Debtors' Exhibit 3 and 4, CTC Exhibit 22). Center Coal also obtained an undivided 55 percent interest in the oil and gas rights to the oil and gas to be extracted from the Property. (T–98). It is without dispute that at all times relevant to this matter, Center Coal owned and continues to own 100 percent of the coal and coal mining rights and 55 percent of the oil and gas rights at the Property. (T–98, 314–315).

It is also without dispute that CTC holds an undivided 22½ percent ownership interest in the oil and gas rights at the Property which is derived from Davant's reservation of "all of the oil, gas, petroleum, and sulphur" under the 1953 and 1954 deeds executed by Davant. (T–332). Davant had died and left an undivided 22½ percent interest in the gas to Hortense Davant and an undivided 22½ percent interest in the gas to his widow Grace Davant. (T–315; CTC Exhibit 24). By deed dated September 20, 1991, CTC acquired the 22½ percent ownership interest in the gas located at the Property, which initially was left to Grace Davant upon Davant's death. (T–320; CTC Exhibit 29).

On February 15, 1972, United States Pipe and Foundry Company (U.S.P. & F.) obtained a coal mining lease and an oil and gas lease from Center Coal. This lease was assigned by U.S.P. & F. to United Land and, ultimately, from United Land to Resources, who conducted and still conducts coal mining operations on the property. (T–412, 424–425, Debtors' Exhibits 9–13, 15, 18). It appears that Resources and Sonat Enterprises ("Sonat") formed a joint venture to recover and market the methane gas. Although it is unclear from the record that this joint venture was really a joint venture, be that as it may, the newly formed Black Warrior Methane Corporation ("Black Warrior") is the entity who participated with Resources in the degasification project at the Brookwood Field. Resources and Sonat each hold a fifty percent ownership interest in Black Warrior.

In its coal mining operation, Resources is required by both federal and state regulations to remove enough methane from the mines to prevent concentrations from exceeding safe levels for coal miners. (T–351). Methane gas is a by-product of coal mining which is harmful to mine workers and which, therefore, is removed from the coal mine as part of the coal mining operations. (T–293, 351). Historically, Resources, as the degasification operator, considered the methane gas to be a mere waste product of coal mining and threw away the gas by venting it into the atmosphere. (T–86).

Beginning in 1977 through 1981, however, the consulting firm of Intercom began discussions and eventually negotiations with Resources regarding the capture and sale of the methane gas. (T–87—88). In 1981, Intercom demonstrated that it could feasibly produce commercial quantities of gas from the

coal seams. (T–89). Negotiations culminated in the execution of an Operating Agreement dated April 24, 1981 ("Operating Agreement") between Enhanced Energy Resources, Inc. ("Enhanced Energy") and Resources to capture and produce the methane gas previously vented into the atmosphere and to market the gas. (T–90–92, CTC Exhibit 34).

From 1981 until 1983, Enhanced Energy was the operator of the degasification project. (Debtor's Exhibits 19–20). From 1983 forward, Black Warrior operated the wells. (T–117, Debtor's Exhibit 21).

Resources and a committee formed by Resources and Enhanced Energy believed that methane gas could not be extracted and marketed unless oil and gas leases were obtained from the owners of the gas rights at the Property. (T–103, 108, 402–403). A policy decision was made that although coal leases were already in place, (T–93), Resources had to obtain oil and gas leases before any wells were drilled. (T–101, 102, 402, 403, CTC Exhibit 34, p. 1). Resources obtained oil and gas leases from Center Coal on May 13, 1981 and November 4, 1985. (T–94, 98, CTC Exhibit 51 and 63).

Kenneth Lee Ancell (Mr. Ancell), the project manager of the gas production at the Brookwood Field from 1977 through August 1982, was responsible for obtaining the oil and gas leases (T–92, 93). Mr. Ancell believed that Center Coal held a 100 percent ownership interest in the oil and gas, when in fact Center Coal's interest was only 55 percent. (T–98, 99). As a result of this mistake, royalty payments made to Center Coal were made as though Center Coal owned 100 percent of the oil and gas. (T–99, 100). Noteworthy is that the amount of royalties paid to Center Coal was determined by reference to the oil and gas lease between Resources and Center Coal and not by reference to the coal lease between them. (T–549–550). Mr. Ancell testified that had he been made aware of the fact that Center Coal held only a 55 percent ownership interest in the gas, the royalty payments would have been reduced to 55 percent. (T–100). If Resources believed that the methane gas belonged to the coal owner and not the gas owner, then CTC would never have believed that gas leases were necessary. Clearly, Resources believed that the right to market the gas extracted belonged to the gas owners and not the coal owners. (T–100, 101–103, 402–403, CTC Exhibit 82).

This record is devoid of any evidence that United Land extracted and sold any methane gas in which CTC claims an ownership interest. In fact, although CTC filed a proof of claim against United Land, CTC's case focused solely upon the activities and conduct of Resources. This Court, therefore, finds that CTC did not meet its burden of proving its claim against United Land and that Proof of Claim No. 117 should be disallowed.

This leaves for consideration the claim of CTC against Resources which, in turn, requires the legal analysis of the parties' ownership interests in the methane gas extracted from the Property and sold by Resources. Property interests are created and defined by state law. *See Butner v. U.S.*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). Under the *Erie* doctrine, the choice of law principles of the state in which the federal court resides should be applied. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under Florida law, the law of the state where the property is situated furnishes the rules which govern the property. *See Connor v. Elliott*, 79 Fla. 513, 85 So. 164, 165 (1920), *cert. dismissed* 254 U.S. 665, 41 S.Ct. 148, 65 L.Ed. 465; *Quintana v. Ordono*, 195 So.2d 577, 579–80 (3rd Dist.Ct.App.1967). The Property is located in Alabama and, therefore, Alabama law creates and defines CTC's interests in the methane gas.

Under Alabama law, interests in coal, gas and coalbed methane gas constitute separate and severable interests in real property which may be conveyed separately or with any other interest in real property. *See NCNB Tex. Nat'l Bank, N.A. v. West*, 631 So.2d 212, 221–24 (Ala.1993). As previously discussed, Center Coal owns 100 percent of the coal and 55 percent of the gas located at the Property and CTC owns 22½ percent of the gas located at the Property.

This leads to the next consideration which is whether CTC, as the gas owner, or Resources, as the lessee of the coal pursuant to a lease with coal owner Center Coal, had ownership interests and/or rights to the specific methane gas extracted from the Property by Resources. The Supreme Court of Alabama's opinion in *West*, 631 So.2d at 221–24, relied upon by both parties, held that the substantive law of Alabama is determinative of this issue. In *West*, the Alabama Supreme Court noted that the majority of states follows the "ownership-in-place" theory of ownership of natural gas, holding that "the owner of a tract of land holds the fee in oil and gas underlying the boundaries of his property even though the oil and gas are not the subject of actual possession until brought to the surface." *West*, 631 So.2d at 223 (citations omitted).

Alabama, however, does not follow the "ownership in place" theory of ownership. As stated by the Alabama Supreme Court,

Alabama determines ownership of oil and gas under the nonownership theory, which recognizes the migratory nature of oil and gas and requires actual possession to establish ownership. The owner of property containing gas has the right to reduce the gas to possession or to sever the gas rights by conveyance. The nonownership theory of gas ownership, because it recognizes the migratory nature of oil and gas, requires actual possession to establish ownership of the resource, and the right held by the landowner is 'the right to reduce the oil and gas to possession or to sever this right for economic consideration.'

*West*, 631 So.2d at 223 (citations omitted).

... [T]he ownership of coalbed gas depends upon its location at the time the gas is recovered or 'captured,' at which time it is reduced to possession.

. . . . .

Coal, like gas, is part of the realty, subject to ownership, severance, and sale. . . . [The coal owner's] property rights includes the right to reduce to possession any gas trapped within the coal itself, so long as that gas remains within the coal until the time of its capture. However, due to the migratory nature of natural gas, the coal owner would lose any right to possess coalbed methane gas once that gas migrates out of his property and thus beyond his right to reduce the gas to possession.

. . . . .

... [S]o long as the coalbed gas is bound within the coal seam in which it originated, the holder of the coal estate has the right to extract the gas and reduce it to possession. However, once the coalbed gas migrates out of the stratum in which it originated, the right to recover the gas belongs to the holder of the gas estate.

*West*, 631 So.2d at 223–24 (citations omitted).

Thus, the location at which Resources "captured" the coalbed methane gas determines whether CTC, as a gas owner, or Resources, the lessee of the coal owner, possessed rights to the methane gas extracted and sold by Resources. CTC contends that the methane gas captured within the gob wells and then sold by Resources originated in non-coal strata and/or migrated from coal strata into the gob zone at the Property and that, therefore, CTC has a legal right and interest in the methane gas from the gob wells. In opposition, the Debtors claim that all of the gas that the Debtors sold was captured in the coal seam before the gas left the coal seam unrecovered and as such it belonged to the Debtors and not to CTC. The parties' arguments cannot be understood without an overview of the coal mining operation at the Property, in particular the degasification methods.

The coal mining operations at the Property primarily employ the "longwall mining" method whereby a longwall mining machine cuts into a coal seam and removes panels of coal. (T–58, 59). A system of braces and supports is employed to enable the longwall mining machine to enter the mine and remove the coal. Methane gas is generated from the coal in situ as it moves up the coalification process from peat to lignite, to sub-bituminous coal, to bituminous coal, to anthracite coal. As the coalification process goes on, the methane is actually generated in place. Methane is stored in the coal by the physical process of adsorption. (T–138, 140).

The process of extracting or removing the methane gas from the coal, or other material that is holding the gas, is known as "degasification." (T–135).

Four methods of degasification are used at the Brookwood Field—ventilation fans; vertical wells; horizontal boreholes; and gob wells. (T–436, 442, 448, 459). Ventilation fans are located at the mine surface and circulate air through the mine shafts, removing methane in the process. Vertical degasification wells are drilled from the surface into one or more coal seams. This is done five to ten years ahead of expected coal mining activities in order to allow more time to drain the gas from the coal prior to mining. (T–436, 437). Horizontal boreholes, on the other hand, are drilled by a tractor-like machine which is located in the mine. Holes are drilled in the side of a coal seam from the underground portion of an active coal mine. (T–446).

The fourth degasification method is the gob well. During longwall mining activities, a void is formed by the extraction of the coal. The advancement of the longwall mining machine and the system of braces and supports causes the roof to collapse and create what is called the "gob," a pile of rocks, about fifteen to twenty feet high. (T–59–60, 449). Gob wells are drilled shortly before the coal mine operation runs under the location of the well. (T–448). They are drilled to intercept coalbed methane that desorbs from coal seams above the coal seam being mined upon formation of the gob or rubble zone. (T–448).

One of CTC's arguments that can be quickly disposed of as unpersuasive is that the methane gas captured within the gob wells and then sold by Resources originated in non-coal strata. Some of the other strata that lie under the ground besides coal are sandstone, shale, siltstone and sandy shales. (T–460). Although CTC's witness, Mr. Ancell testified that all the gas which is captured by the gob well is coming either from the coal seams or the sandstones, (T–73–74), Mr. Ancell could not tell which one and later testified that all of the gas in question was produced from coal seams. (T–74, 161). CTC's witness Mr. Huddleston testified that

he could not say whether any of the gas came from noncoal strata. (T–267). Finally, CTC's witness, Mr. Skidmore testified to only "possibilities and probabilities" that some gas came from other strata, but did not give a specific percentage. (T–226). While it is possible that methane gas can originate in non-coal strata, the mere possibility is insufficient support for CTC's argument that the subject methane gas was derived from non-coal strata.

On the other hand, the evidence presented by the Debtors overwhelmingly supports the Debtors' contention that the subject methane gas was derived from coal, albeit not necessarily coal from the Blue Creek/Mary Lee coal seams being mined. After a review of a core analysis of the strata at the Property, (Debtor's Exhibits 228 and 229), Debtors' expert, Mr. Sanders', opined that the source of the gas that is in the gob wells is the coal seam because the non-coal strata do not have the capacity to contain any gas. (T–460). Further, based upon Mr. Sanders' personal knowledge, no well in the Black Warrior Basin has ever produced any methane from sandstone or shale. (T–470). In addition, coal dust, a contaminate, found in the gob well gas would not be present if the gas was from the sandstones and shales. (T–471, 473). Pursuant to the Natural Gas Policy Act of 1978, Black Warrior was required to file with the State Oil and Gas Board an application indicating the source of the gob gas in order to qualify the wells to be deregulated. The State Oil and Gas Board reviewed the application and ruled that the gas is coal seam gas, certified it and sent it to the Federal Energy Regulatory Commission. (Debtors' Exhibits 183 through 187). Clearly, the source of the methane gas in question is coal seam.

■ Turning to the issue of where the coalbed methane gas is captured, this Court is satisfied, based upon the testimony of both parties' witnesses and the exhibits introduced into evidence, that the methane gas extracted by Resources via the horizontal wells and vertical wells is captured directly from the coal seam and therefore, belongs to the coal owner and not CTC. With respect to the vertical wells, Debtors' witness Mr. Sanders'

opined that the source of the gas that comes from the vertical wells is the coal seam. Mr. Ancell testified that one of the distinguishing characteristics of a vertical well is that "it's perforated in the coal seams." (T–151). Similarly, this Court finds that the methane gas extracted by Resources via the horizontal borehole degasification method is captured directly from the coal seam and therefore belongs to the coal owner and not CTC.

■ Having disposed of the issues of the point of capture of the gas by the vertical and horizontal borewells, the remaining issue is the point of capture of gob well gas. CTC contends that the methane gas captured by the gob wells migrated into the gob zone after its liberation and escape from the coal seams. Mr. Ancell's opinion is that the source of the gas from the gob wells in Brookwood Field is the coal seams that are not being mined, whether above or below the coal seams being mined. (T–130, 134). When the Mary Lee is not mined, the methane gas ends up in the gob. The gas that is in the coal is released into the gob almost immediately, it escapes and migrates throughout the gob into the gob well. Mr. Ancell testified that by the time the longwall panel starts the degasification, the gas from the Mary Lee/Blue Creek coal seams has been drained for a long time so the bulk of the gas had already escaped out of the seam that is being mined. In other words, the vast majority of the gas is already out of the seam by the time the longwall mining started. The significance of that is that any gas then that comes into the gob area has to come from a source other than the seam being mined. CTC contends that gob gas is "captured" by the surface equipment existing at the top of the gob well. (T–71, 252). Under the "gas sales system" utilized by Resources, the gas goes from the well through a filter, flame arrester, compressor, separator, and meter, and into a gas sales product line. (T–71). This Court is satisfied that the methane gas recovered by the gob wells was not captured while still within its originating coal seam as required by *West*, 631 So.2d at 224 & n. 12. The testimony of Messrs. Huddleson and Ancell is that methane gas in the gob zone is not captured while it is travelling. (T–146, 246). Rather, the gas is captured only after it passes the first control valve at the surface. (T–246, 253).

This Court is not persuaded by Resources' argument that the definition of "capture," as it pertains to the gob well gas, is exerting control over a molecule by creating the pressure sink to cause it to move from its current location. (T–497). Resources lost any rights to gob well gas because the gas did not remain within the coal until the time of its capture. (T–450–456). Clearly, the coalbed gas migrated out of the stratum in which it originated and therefore, the right to recover the gas belonged to CTC as holder of the gas estate.

■ Although CTC holds a 22½ percent ownership interest in the coalbed methane gas extracted by the gob wells and sold by Resources, this Court does not believe that Resources' extraction and sale of the gas constitutes a conversion. "To constitute conversion, there must be a wrongful taking or wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse of another's property." *See Covington v. Exxon Co., U.S.A.*, 551 So.2d 935, 938 (Ala.1989) (citations omitted). Here, however, Resources had the right to extract the gas in order to ventilate the coal mines, with CTC being entitled to share in the profits made on any sale of that gas. *West*, 631 So.2d at 229. Furthermore, Resources and its lessor, as the owner of 55 percent of the gas, had the right to remove the gas as a cotenant and for that reason no conversion claim can lie. *See Sun Oil Co. v. Oswell*, 258 Ala. 326, 62 So.2d 783, 787 (1953) (tenant in common does not commit tort by severing minerals from property, however, the other tenants in in common have a cause of action against the tenant to the extent of the disproportionate use of the minerals).

■ Where as here, the coal owner captures and sells gob gas, the gas owners are entitled to share in any profits on such sales after taking into account the cost borne by the coal owner in capturing and marketing the gas. *West*, 631 So.2d at 223. It is without dispute that CTC has not been paid anything for the methane gas extracted from the Property and sold by Resources. (T–

127, 547). By failing to pay CTC for the methane gas extracted and sold, Resources has been unjustly enriched. Therefore, although Resources is not liable for conversion of the methane gas, Resources is liable under the equitable principle of unjust enrichment.

Bearing in mind that one of the overriding concerns in bankruptcy is to keep administrative expenses at a minimum in order to preserve as much of the estate as possible for the creditors, *See Otte v. United States*, 419 U.S. 43, 95 S.Ct. 247, 42 L.Ed.2d 212 (1974), post-petition expenses are generally recognized as allowable administrative claims where the expenses are beneficial to the estate and help to preserve the assets of the estate. *See In re Dant & Russell, Inc.*, 853 F.2d 700 (9th Cir.1988); *In re Subscription Television of Greater Atlanta*, 789 F.2d 1530, 1532 (11th Cir.1986) (there must be an actual, concrete benefit to the estate before a claim is allowable as an administrative expense); *In re Apollo Moving Specialists of Daytona Beach, Inc.*, 137 B.R. 538 (Bankr. M.D.Fla.1992). CTC has demonstrated that Resources, as a cotenant, used CTC's property, consisting of the coalbed methane gas which Resources extracted via the gob wells. The concrete benefits conferred upon Resources' bankruptcy estate are Resources' ability to mine the Blue Creek coal seam economically by the use of gob wells, (T–213–214, 292–294, 383), and the profits derived from Resources' sale of the methane gas from the gob wells. (T–213–214, 292–294, 404–405). "A primary purpose of according administrative priority to claims is to prevent unjust enrichment of the bankruptcy estate, not merely to compensate creditors." *See Matter of Retsod, Inc.*, 99 B.R. 499, 504 (Bankr.M.D.Ga.1989). *See also American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119, 126 (2nd Cir.1960) (Act case) ("... the purpose of according priority in these cases is fulfillment of the equitable principle of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him.").

CTC having established Resources' liability to CTC for administrative expenses, this Court now turns to the issue of the amount of damages to which CTC is entitled. CTC asserts a claim for the amounts that it contends would have been paid to CTC had Resources realized that Center Coal was not entitled to 100 percent of the royalties from the sale of the gas. CTC claims actual damages in the amount of at least $2,304,970.00 for the period of 1990 through August 1996, (T–39), as well as punitive damages.

Although CTC calculated its damages based on the sale of methane gas beginning in 1990, CTC did not acquire an interest in the gas at the Property until September 20, 1991. This Court, therefore, finds that CTC's claim to a proportional share of the net profits from the sale of the methane gas in 1990 should be disallowed. Similarly, CTC is not entitled to an award of administrative expenses after March 2, 1995, the date of confirmation of the Debtors' Plan of Reorganization. This Court is unable to determine what portion of the 1991 revenues is attributable to the period of time between September 20, 1991 and December 31, 1991 and what portion of the 1995 revenues is attributable to the period of time between March 2, 1995 and December 31, 1995. Therefore, this Court finds that a hearing should be scheduled to determine what revenues were earned by Resources from the sale of gob well gas during the period of time between September 20, 1991 and December 31, 1991 and the period of time between January 1, 1995 and March 2, 1995.

Resources argues that even if CTC is entitled to share in the profits realized by Resources' sale of the gas, CTC's share in the profits is not equivalent to CTC's 22½ percent interest in the gas. If it were, contends Resources, then CTC would be receiving 100 percent of the profits realized from Resources' sale of the gas belonging to CTC. Rather than share the profits, however, Resources argues that CTC's fractional share is de minimis after accounting for Resources' capital investments and risks, the profits that CTC could reasonably have expected to earn if it had undertaken to capture and market the gob gas without Resources' assistance, and the percentage of profits that would induce Resources to take the risks and invest

the money necessary to market the gas instead of simply venting it.

At first blush, this argument sounds reasonable. Upon a closer analysis, however, Resources' argument is flawed in several important respects. First, the necessity of Resources' expenditure of millions of dollars for its coal mining operation would remain whether or not Resources sold the gob well gas. Second, Resources has ignored one of the benefits that it received from the gob well degasification method, which is the ability to conduct its coal mining operation economically. Finally, Resources was fully aware of the necessity of obtaining leases from the gas owners whereby the royalties due the gas owners would be negotiated and agreed upon. In fact, Resources admits that Center Coal was paid royalties based upon Resources' mistaken belief that Center Coal owned 100 percent of the gas at the Property. Yet, rather than present evidence demonstrating what 22½ percent of Center Coal's royalties would be, Resources merely contends that CTC's share is de minimis.

CTC shall not bear the burden of Resources' failure to obtain a gas lease from CTC prior to transporting and selling CTC's gas. CTC has met its burden of proving its entitlement to 22½ percent of the net profits and Resources has not presented sufficient evidence that CTC's share should be a percentage lower than the 22½ percent.

CTC's calculation of damages is based upon CTC Exhibits 1–8, Resources' financial documents regarding Resources' gob well operations. The parties stipulated that the numbers contained in the financial documents, CTC Exhibits 1–8 are correct. (T–119–120). CTC Exhibit 96, which is reproduced below, in pertinent part, is a summary of CTC Exhibits 1–8, which was prepared by CTC's witness, Mr. Ancell.

### CTC DAMAGES

| | GOB WELL PRODUCTION (mcf) | REVENUE | COSTS (CAPTURE/ MARKETING) $ | GROSS PROFITS $ | CTC INTEREST |
|---|---|---|---|---|---|
| 1990 | 104,647 | 445,796 | 109,879 | 335,917 | 75,581 |
| 1991 | 1,011,063 | 4,640,779 | 1,091,948 | 3,548,831 | 798,487 |
| 1992 | 577,825 | 2,248,035 | 535,512 | 1,712,523 | 385,318 |
| 1993 | 994,299 | 3,837,994 | 954,527 | 2,883,467 | 648,780 |
| 1994 | 1,536,246 | 2,949,592 | 1,305,809 | 1,643,783 | 369,851 |
| 1995 | 445,456 | 806,275 | 329,637 | 476,638 | 107,244 |
| 1996 thru Aug | 182,911 | 466,423 | 148,158 | 318,265 | 71,610 |

### GOB WELL DAMAGES
### $ 2,456,871

---

The second column entitled "Gob Well Production (mcf)" reflects CTC's summary of Resources' production of gob well gas, calculated by multiplying the unit price by the number of mcf, i.e. thousand cubic feet, produced. (T–123). In calculating the gob well gas production, CTC failed to take into account that approximately 92 percent of the gob well gas produced is actually sold. (T–490–507). Further, while CTC argues that 100 percent of the gob gas produced jointly belongs to Resources and Sonat, CTC has ignored that Resources receives and sells only 50 percent of the production available for sale, with the remainder belonging to Sonat, which separately markets its portion to a different purchaser under a different contract. (T–304, 490–91).

CTC had calculated actual damages based upon 100 percent of Resources' gob well gas production because it contends that Resources and Sonat are joint venturers and

that, therefore, the liability is joint and several. This Court finds otherwise, however, as the Operating Agreement, subject to certain modifications which are irrelevant to this discussion (Debtor's Exhibits 20–39), which controls the relationship between Resources and Sonat expressly states otherwise, providing in pertinent part,

> The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

Debtors' Exhibit 19, Art. VII, par. A.

The third column reflects CTC's calculation of Resources' gross revenues from the sale of the gob well gas produced. By calculating gross revenues based upon the sale of all of the gob well gas produced, CTC failed to recognize that Resources received revenues from only that portion of the gob well gas that Resources sold under its contract. (T–304, 508). Although Resources contends that its sale of its gas produced is not equal to Sonat's, Resources has not presented evidence of the amount of gross revenues that Resources received from the sale of its gob well gas produced during the period from September 20, 1991 through March 2, 1995. Thus, although this Court finds that CTC's calculation of Resources' gross revenues is erroneous, this Court is unable to determine the amount of gross revenues earned by Resources in order to calculate actual damages.

The fourth column reflects CTC's calculation of the costs of capturing and marketing the gob well gas. It is without dispute that in calculating the costs, CTC did not include all of the costs. CTC did not include the cost of drilling the gob wells because that cost is part of the degasification process and pertains to the coal mining operation and not the gob well operation. (T–128, 290). Although Resources is quick to point out that the capital costs associated with drilling and completing the gob wells were approximately $1,400,000, (T–509), Resources failed to present evidence of Sonat's or Kaneb's proportional share of the cost of developing and operating the gob wells at the property. Resources also failed to recognize the benefit of the gob well degasification method, and thus, failed to attribute any portion of this capital cost to the coal mining operation at the Property.

CTC also did not consider royalty payments as a cost item, contending that since no oil and gas lease is in place, there were no royalties to be paid. (T–127). As discussed earlier, Resources paid Center Coal royalties as if Center Coal owned 100 percent of the gas produced at the Property. While this Court finds that a portion of the royalty payments to Center Coal should be deducted as a cost item, that calculation is not equivalent to the total royalties paid to Center Coal.

Both parties have presented an all or nothing calculation of actual damages. On the one hand, CTC failed to account for the gob well gas which was not actually sold by Resources, failed to include various cost items and calculated an inflated amount as actual damages due CTC. On the other hand, Resources failed to account for Sonat's proportional share of the costs, failed to attribute any of its capital costs of drilling the gob wells to its coal mining operation and in fact came up with a negative net profit for purposes of calculating CTC's actual damages.

This Court finds that Resources has been unjustly enriched and that CTC's claim should be allowed in an amount based upon the net profits realized by Resources and not Sonat. Based upon the record before this Court, however, CTC's actual damages cannot be calculated and, therefore, this Court finds that a hearing should be scheduled to enable this Court to determine the same.

■ As to CTC's claim for punitive damages, CTC contends that it is entitled to punitive damages as a result of Resources' refusal to account for any gas recovered from the Property since the publication of the Supreme Court of Alabama's opinion in *West, supra.* CTC claims that the Debtors' conduct is intentional and egregious and that Alabama law permits punitive damage awards for the intentional taking of another's property, citing Ala.Code Sec. 6–11–20

(1996). This Court finds, however, that an award of punitive damages against Resources is inappropriate. As previously discussed, Resources did not convert CTC's property and this Court does not find Resources' extraction and sale of the gas to be egregious, warranting an award of punitive damages.

In view of the foregoing, this Court finds that the Debtors' Objections to Claim No. 117 and 580 should be sustained in part.

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that United Land's Objection to Claim No. 117 filed by CTC be, and the same is hereby sustained and Claim No. 117 is hereby disallowed. It is further

ORDERED, ADJUDGED AND DE-CREED that Resources' Objection to Claim No. 580 be, and the same is hereby sustained in part. CTC is hereby allowed an administrative claim for 22½ percent of the net profits realized by Resources from the extraction and sale of coalbed methane gas from the gob wells at the Property during the period of time from September 20, 1991 through March 2, 1995. It is further

ORDERED, ADJUDGED AND DE-CREED that a status conference is hereby scheduled for April 17, 1997 at 1:30 p.m., at which time this Court will determine the propriety of assigning to mediation, pursuant to Local Rule 2.23 (Bankr.M.D.Fla.), the following issues related to actual damages:

(a) What was the amount of gob well gas produced by Resources and Sonat which was actually sold during the period from September 20, 1991 through March 2, 1995;

(b) What were the specific direct costs of capturing and marketing the gob well gas which were incurred by Resources and Sonat during the period of September 20, 1991 through March 2, 1995;

(c) What were Resources' and Sonat's and/or Kaneb's proportional share of the direct costs related to the operation of the gob wells at the Property and related to the transportation and marketing of the gob well gas sold during the period of September 20, 1991 through March 2, 1995; and

(d) What were the gross revenues earned specifically by Resources from the sale of methane gas extracted from the gob wells during the period of time between September 20, 1991 and March 2, 1995.

The parties may file a written consent to mediation within ten days of the date of the entry of this Order, and if filed, the status conference will be canceled and a separate order directing mediation will be entered by this Court which will provide for the appointment of a mediator, set the hourly rate and a cap for mediation fees and provide a deadline for the appointed mediator to file a report and notice of completion of mediation. It is further

ORDERED, ADJUDGED AND DE-CREED that a final evidentiary hearing is hereby scheduled for July 14, 1997 at 9:00 a.m., to determine the issue of actual damages. The final evidentiary hearing will be cancelled upon the mediator's filing no later than June 30, 1997, a report reflecting that the dispute has been completely resolved. It is further

ORDERED, ADJUDGED AND DE-CREED that the Debtor's Motion for Partial Summary Judgment seeking the disallowance of CTC's claim for punitive damages, be and the same is hereby denied as moot.

DONE AND ORDERED at Tampa, Florida, on March 28, 1997.