**In re MOODY & SONS, INC.,
et al., Debtors.**

**No. 3:09–bk–6247–JAF.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

May 16, 2012.

---

27. Doc. No. 56.

Richard R. Thames, Jacksonville, FL, for Debtors.

Edward P. Jackson, Jacksonville, FL, for Claimant.

### FINDINGS OF FACT AND
### CONCLUSIONS OF
### LAW

JERRY A. FUNK, Bankruptcy Judge.

This Case is before the Court on the Application For Payment of Administrative Claim in the Amount of $750,000 (Doc. 737, the "Application"), filed by Gerald Dake & Associates, Inc. The Court held a hearing on February 17, 2012 and took the matter under advisement. In lieu of oral argument, the Court directed the parties to submit memoranda in support of their respective positions. Upon the evidence presented at trial, and the memoranda of the parties (Docs. 1099, 1100), the Court makes the following Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052. The transcript of the underlying trial proceedings (Doc. 1091) will hereinafter be referred to as "Tr." followed by the appropriate page number. For the reasons provided herein, the Application (Doc. 737) will be denied in part.

### FINDINGS OF FACTS

Gerald Dake & Associates, Inc. (hereinafter, "Dake") is a real estate development firm that provides consultation services to develop, market, and sell commercial real estate. Moody & Sons, Inc. (hereinafter, the "Debtor") owns a large parcel of land on the intracoastal waterway in Jacksonville, Florida, commonly referred to as the "Bellinger Property." Even though the Bellinger Property (hereinafter, the "Property") is in a prime location, its use has been (and remains to be) that of an industrial shipyard.

On or about May 1, 2007, the Debtor entered into a Consulting and Marketing Agreement with Dake to sell the Property (Debtor's Ex. 1, the "Agreement"). In addition to serving as the listing broker for the sale of the Property, Dake was charged with facilitating a change in the Property's land use classification, and with clearing several title issues with the State of Florida (Debtor's Ex. 1).[1] Specifically, the Agreement provided that Dake's "Consulting Services" included: (1) site plan development; (2) coordination with engineers and other professionals with respect to advantageous development use of the Property; (3) coordination and acting as a liaison with governmental agencies with respect to land use matters; (4) assistance with securing rezoning for the Property as a multi-unit residential/commercial complex with a marina; and (5) development of marketing materials and strategies for the sale of the Property (Debtor's Ex. 1 at 6–7; Doc. 170–1 at 7–8).

In consideration for Dake's "Consulting Services," the Agreement provided that Dake was to receive a sliding-scale commission fee upon the sale of the Property (Debtor's Ex. 1 at 3). A "Sale" of the Property is defined in the Agreement as a transfer of deed from the Debtor to another entity (Debtor's Ex. 1 at 4). The Agreement additionally contained an "Early Termination Fee" provision which provided:

> In the event that Moody [the Debtor] and Dake agree to terminate this Agreement prior to a sale of the property, Moody shall pay Consultant [Dake] an aggregate early termination fee equal to $750,000 unless Moody terminates this Agreement due to the Consultant's failure or refusal to perform [its] respective

---

1. The Property did not have a land use classification for what was, at the time, believed to be its highest and best use, or that of a multi-unit residential complex with a marina. In addition, the State of Florida apparently claimed title to the marina "basin" area. Clear title to the basin area would be required in order to construct marina boat-slips on the Property.

duties hereunder (after thirty days notice and opportunity to cure) in which case no amount will be payable by Moody to the Consultant.

(Debtor's Ex. 1 at 4).

Since changing the land use classification for the Property and clearing title with the State of Florida were complex and lengthy processes, Dake recommended that the Debtor retain the services of attorneys Paul M. Harden and Miguel Collazo (Tr. 28–29). In August 2006, Mr. Harden filed an Application for Semi–Annual Land Use Amendment to the Future Land Use Map ("FLUM") Series—2010 Comprehensive Plan for the Bellinger Property. Pursuant to the application, Mr. Harden requested a 2010 Comprehensive Plan FLUM designation for the Bellinger Property as Community General Commercial, and a Zoning District Designation of Planned Urban Development ("PUD"). On May 14, 2007, the Council of the City of Jacksonville adopted: (1) Ordinance 2007–355–E changing the FLUM for the Bellinger Property from WD–WR to Community General Commercial; and (2) Ordinance 2007–356–E changing the zoning to PUD (Dake Ex. 3 at 15). On July 9, 2007, the Department of Community Affairs ("DCA"), a State Land Planning Agency, issued a notice and statement of intent, alleging Ordinance 2007–355–E was not in compliance with Florida Statutes and that the FLUM amendment conflicted with policies of the State Comprehensive Plan (id.). On August 1, 2007, the DCA filed a petition for an administrative hearing; whereupon, extensive administrative proceedings ensued (see id. at 16–17).

On June 10, 2009, the State of Florida Administration Commission directed the City of Jacksonville to take remedial actions to bring the FLUM amendment into compliance with the Florida Statutes (id. at 26–30). The Administrative Commission also approved the rezoning, land use change, and redevelopment of the Bellinger Property, subject to the City of Jacksonville adopting specific provisions into the comprehensive plan through remedial action (id.).

As the aforementioned lengthy process was nearing completion, on July 28, 2009, the Debtor filed a petition for protection under Chapter 11 of the Bankruptcy Code. Shortly thereafter, on August 14, 2009, the Debtor filed an application to employ the law firm of Hopping Green & Sams, P.A. as special counsel pursuant to 11 U.S.C. § 327(e) (Doc. 58).[2] In the application, the Debtor stated it estimated the re-zoning of the Property to mixed commercial and residential use would increase the value of the property by $5,000,000 to $10,000,000 (Doc. 58 at 3). In its Order authorizing the retention of Hopping Green & Sams, P.A. as special counsel, the Court provided that all compensation for services rendered and costs expended "shall be determined by the Court upon application in accordance with § 330 of the Bankruptcy Code" (Doc. 104 at 2).[3]

Similarly, on August 18, 2009, the Debtor filed an application to employ attorney Paul M. Harden as special counsel pursuant to 11 U.S.C. § 327(e) (Doc. 69). In the application to employ Mr. Harden, the Debtor stated it estimated the re-zoning of the Property to mixed commercial and residential use would increase the value of the property by $5,000,000 to $10,000,000 (Doc. 69 at 3). The application provided that the contracted fee arrangement between

---

2. Attorney Collazo is employed by Hopping Green & Sams, P.A.

3. It should be noted that Hopping Green & Sams, P.A.'s final application for fees and costs amounted to $23,973.24 in fees and $2,834.24 in costs (Doc. 1112).

Mr. Harden and the Debtor was $250,000 (Doc. 69 at 6). In its Order authorizing the retention of Mr. Harden as special counsel, the Court provided that it did not endorse or approve the proposed $250,000 fee arrangement, *supra*, but rather, all compensation for services rendered and costs advanced by Mr. Harden were "[to] be determined by the Court upon application in accordance with § 330 of the Bankruptcy Code" (Doc. 103 at 2).[4]

On August 25, 2009, approximately thirty (30) days after the Petition Date, following a settlement of issues with the DCA, the City of Jacksonville adopted Ordinance 2009–621 to effectuate the remedial FLUM Amendment in accordance with the June 10, 2009 order of the Administrative Commission, *supra*. This settlement was approved in a final order by the Governor and Cabinet of the State of Florida sitting as the Administration Commission (AC case No. ACC–09–001). With the exception of the marina basin title issues, the settlement effectively concluded the land use and zoning matters related to the Property.

On September 22, 2009, the Debtor filed a document entitled "Application to Employ Gerald Dake Associates, Inc. as Real Estate Broker" (Doc. 170). The application to employ Dake provided that Dake "agreed to act in [its] capacity in accordance with the pre-petition Consulting and Marketing Agreement [*supra* ]," which was attached to the application as Exhibit A (Doc. 170 at 3; *see also* Doc. 170–1, Ex. A). The application provided that any compensation to Dake would be based on a sliding-scale commission (the same as provided in the pre-petition Agreement), "[to] be paid at closing of any sale of the Bel-

linger Property" (Doc. 170 at 8). The application to employ expressly provided that it is "not intended to be, nor shall it be construed as, an assumption of the [prepetition] Agreement pursuant to 11 U.S.C. § 365" (Doc. 170 at 9).

In the Court's Order Authorizing the Debtor's Application to Employ Gerald Dake & Associates, Inc. as Real Estate Broker (Doc. 202), the Court provided: (1) the Debtor was authorized to employ Dake as of the Petition Date; (2) Dake would be entitled to a commission based on the gross selling price of the Property (to be paid at the closing of any sale); (3) any compensation or reimbursement for costs must be approved by the Court upon application under section 330 of the Bankruptcy Code; (4) the Debtor did not assume the pre-petition Agreement; and (5) no breakup fees or other fees required under the pre-petition Agreement shall be paid to Dake unless approved by the Court following notice and a hearing (Doc. 202 at 2).

In accordance with its post-petition employment agreement, Dake listed the Property and apparently exposed it to numerous potential buyers. In addition, Dake maintains it assisted the Debtor, its staff, attorneys Harden and Collazo, the surveyors, and other persons dealing with the yet to be resolved issues regarding title to the marina basin area (Tr. 2–19, 55). Dake asserts it actively assisted attorney Collazo and surveyor Dean Privett in preparing necessary documentation so that the basin area title issues could be resolved with the State of Florida (Tr. 22–25, 41–42). In August 2010, the Debtor reached an agreement with the State of Florida for the Debtor to obtain clear title to the basin area (Doc. 524).[5]

---

4. It should be noted that Mr. Harden's final application for fees and costs amounted to $18,593.75 in fees and $0.00 in costs (Doc. 1082).

5. The Court approved this agreement on May 2, 2011 (Doc. 721).

Apparently dissatisfied with Dake's post-petition efforts to sell the Property, the Debtor terminated Dake's employment by letter dated January 26, 2011 (Debtor's Ex. 4). Thereafter, on February 14, 2011, the Debtor filed a motion to reject the pre-petition Consulting and Marketing Agreement (Doc. 656). On March 17, 2011, the Court granted the Debtor's motion, *supra*, (Doc. 681). Subsequently, on May 12, 2011, Dake filed the instant Application for Payment of Administrative Claim in the amount of $750,000 (Doc. 737); to which, the Debtor filed an objection (Doc. 1065).

It is averred by Dake that the $750,000 it seeks to recover as an administrative expense is not based upon the "Early Termination Fee" provision of the pre-petition Agreement, but rather, is based on a purported $5,000,000 to $10,000,000 increase in the Property's value due to it now being zoned and titled for use as a multi-unit residential/commercial marina (Doc. 1100 at 8–9). When asked, however, whether Dake is seeking compensation only for the time and effort expended by it post-petition, Gerald Dake (Dake's principal) responded:

> I am looking for that, plus I'm looking for some payment as per the agreement for pre-petition efforts because post-petition efforts that were culminated was [sic] a result of all the time and effort [expended] for the two to three years [pre-petition].

(Debtor's Ex. 7 at Depo. p. 35).

When asked what efforts were expended by Dake post-petition, Geral Dake responded: "Post petition we—our [Dake's] effort was mostly in sales, trying to market the [P]roperty" (Debtor's Ex. 7 at Depo. p. 12). With respect to what work occurred pre-petition, Gerald Dake stated the following:

> Pre petition, 99 percent of the zoning and land use effort [...] and the title negotiations had been completed. Post petition there was very little zoning effort that had to be done yet [sic] and very little title work on our [Dake's] part that had to be done. The culmination of the title effort and the signing in 2011 by Moody [the Debtor] was mostly done by Mike [Miguel] Collazo and Hopping, Boyd & Sams in Tallahassee.

(*Id.*).[6]

When asked what Dake considers as the value of its post-petition service(s) in assisting Dean Privett and attorney Collazo with the issues regarding title to the marina basin area, Gerald Dake responded: "I mean, I—it's—I can't—I don't know that. I mean, I—who knows that. But if you tie me to a number, it's $750,000" (Debtor's Ex. 7 at Depo. p. 26). Gerald Dake, however, agrees that the $750,000 "Early Termination Fee" provision, contained in the pre-petition Agreement, was not meant to relate to the value of any services actually rendered by Dake (Tr. 89). Further, Gerald Dake acknowledges that most of Dake's efforts were expended pre-petition (Tr. 90–91). Regarding the post-petition title matters, in response to being asked whether the various accomplishments were the result of efforts expended by Mr. Collazo and his law firm, Hopping Green & Sams, P.A., Gerald Dake stated: "Absolutely" (Tr. 93). Similarly, Gerald Dake stated:

> Mr. Harden's efforts were superior to mine because he was directly involved with that [the title issues]. We [Dake] were just—we were just the advisers to Moody [the Debtor] and the consultants to Moody working with Paul [Harden] to get that final thing [title to the basin

---

6. In addition, Gerald Dake acknowledged that clear title to the marina basin area was not finalized until after Dake had been terminated from its employment by the Debtor (Tr. 29).

area] accomplished. [. . .] There wasn't much done post-petition because it [the title issue] was done pre-petition, but, yes, it got finalized. And we [Dake] didn't have a lot to do with that at the time except advising Moody [the Debtor] [as to] what was going on. . . .

(Tr. 94).

Dake submitted documentation delineating the purported amount of time and costs expended by Dake on efforts to finalize the land use and title issues, and to market and sell the Property (Dake Ex. 9). Gerald Dake testified that the time records, *supra*, were not contemporaneously kept, but rather, were created approximately two (2) years after-the-fact (Tr. 31–34). Gerald Dake acknowledges that the subject hour computations are "guesstimates"; however, he asserts that in his opinion they are accurate (Tr. 35; Debtor's Ex. 7 at Depo. pp. 70–73). As to how Dake arrived at the various time figures, Geral Dake provided the following example:

> Well, it's a guesstimate in that we did not keep time records. And like attorneys keep every 15 minutes or something, we didn't do that. We had to go back and I took the cell [phone] records. For every time there was a telephone call, I used a half hour. It could have been a two-hour phone call but I used a half hour.

(Doc. 1091 at 35).[7]

Likewise, Gerald Dake reported that the information concerning its actual costs and expenditures are based on "guesstimates" (Tr. 31–34; Debtor's Ex. 7 at Depo. pp. 70–73). Gerald Dake testified that he does not keep automobile milage records, and that the $964.60 Dake seeks to recover in travel milage is based upon guesswork (Debtor's Ex. 7 at Depo. pp. 70–71; *see also* Dake Ex. 9 at 1). With respect to various items of actual costs/expenses, Dake requests reimbursement for the following: (1) $224.64 in restaurant bills; (2) $40.28 in "photos"; (3) $182.00 in "aerial photos"; (4) $960.00 for obtaining and installing "For Sale" signs on the Property; (5) $10.00 for courthouse parking; (6) $3,450.00 in the production of "sales packages"; and (7) $22,000.00 for "office and associate support" (Dake Exs. 9, 10).[8]

At trial, Emil Albertini, the Debtor's Chief Financial Officer ("CFO"), testified on behalf of the Debtor (Tr. 100). Mr. Albertini testified that 99 percent of the land use and title issues regarding the Property had been completed prior to the Petition Date (Tr. 103). With respect to the Debtor's opinion as to the amount of post-petition value/effort Dake contributed to the Estate, Mr. Albertini testified that it would not be any greater than that of attorney Harden (Tr. 113–14). To date, the Property remains unsold, and continues to be used as a commercial shipyard.

## CONCLUSIONS OF LAW

In the Application (Doc. 737), Dake seeks allowance of an administrative claim, pursuant to 11 U.S.C. § 503(b), in the amount of $750,000. For the reasons stated below, the request will be denied to the extent provided herein.

In this instance, Dake was retained pursuant to § 327 of the Bankruptcy Code.[9]

---

**7.** It appears Gerald Dake would also have recorded a half hour of time even if a phone call lasted only two minutes.

**8.** Dake apparently paid "office and associate support" in monthly increments of $1,100.00

(representing 20 hours per month at a rate of $55.00 per hour) (Dake Exs. 9, 10).

**9.** Unless otherwise indicated, all references to statutory sections will refer to provisions of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

Compensation for professionals employed under § 327 is governed by § 330, and any fees awarded thereunder are then elevated to administrative expense status by operation of § 503(b)(2). Section 503(b)(2) provides the sole means by which a retained professional may receive payment for services rendered as an administrative expense. *McCutchen, Doyle, Brown & Enersen v. Official Comm. of Unsecured Creditors (In re Weibel, Inc.),* 176 B.R. 209, 213 (9th Cir. BAP 1994) (noting that approval of an administrative expense claim under § 503(b)(2) requires that professional fees be compensable under § 330).

■ Here, with respect to its post-petition employment, Dake was retained as a real estate broker—to be compensated on a commission basis, pursuant to § 330, only in the event of a sale of the Property (Docs. 170, 202). By its express terms, the Order authorizing Dake's professional retention was not an assumption by the Debtor of the pre-petition Agreement. In addition, Dake's post-petition employment did not include any break up fees or any other fees (including the "Early Termination Fee") required under the pre-petition Agreement (Doc. 202 at 2). Since a sale of the Property never occurred, Dake is not entitled to a sales commission, or any other compensation, pursuant to § 330 or, by implication, § 503(b)(2).

■ The Court, however, finds the Debtor's application to employ Dake, and the Court's Order approving Dake's retention (Docs. 170, 202), could be interpreted to contemplate that Dake, in addition to attempting to sell the Property, would continue to provide consulting services with respect to land use matters and obtaining clear title to the marina basin area. Specifically, in the application to employ Dake (Doc. 170), the Debtor states that Dake agreed to act in its capacity as the Debt-or's real estate sales agent "in accordance with the pre-petition Consulting and Marketing Agreement," attached to the application as Exhibit A (Doc. 170 at 3; *see also* Doc. 170–1, Ex. A).

The pre-petition Agreement provides: "In consideration for the Consulting Services, Moody [the Debtor] shall pay to Consultant [Dake] a commission fee … ('Consulting Fee')." Exhibit A to the pre-petition Agreement defines "Consulting Services," in pertinent part, as follows: (1) site plan development; (2) coordination with engineers and other professionals with respect to advantageous development use of the Property; (3) coordination and acting as a liaison with governmental agencies with respect to land use matters; (4) assistance with securing rezoning for the Property as a multi-unit residential/commercial complex with a marina; (5) development of marketing materials and strategies for the sale of the Property; and (6) serving as listing broker for the sale of the Property (Debtor's Ex. 1 at 6–7; Doc. 170–1 at 7–8).

■ Gerald Dake testified that it was his understanding Dake was to continue providing services within the scope of work as defined in the pre-petition Agreement, and that serving as the listing broker was just a part and parcel of Dake's defined scope of work (Tr. 26–27, 55). Gerald Dake testified that he would not have continued providing consulting services with respect to the land use and title matters if he believed Dake's post-petition scope of work was limited to being merely the listing broker for the sale of the property (*see* Tr. 55). Based on the language of the Debtor's application to employ Dake, and the Court's Order approving Dake's employment, the Court agrees that it was reasonable for Dake to be under the impression that, in addition to serving as the

listing broker for the sale of the Property, Dake was to continue to perform consulting services with respect to the various land use and title matters, *supra.* Accordingly, in order to prevent unjust enrichment of the Estate, the Court finds Dake is entitled to its actual, necessary costs in preserving the Estate under § 503(b)(1)(A). For the reasons stated below, however, the Court finds this amount is not equivalent to the $750,000 sought by Dake in its Application, but rather $18,000.

More particularly, pursuant to § 503(b)(1)(A), only those expenses which are actual and necessary to the preservation of the debtor's estate may be allowed as an administrative expense. Specifically, this section of the Code provides:

> (b) After notice and a hearing, there shall be allowed administrative expenses ... including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case....

11 U.S.C. § 503(b)(1)(A).

■ By its express terms, § 503(b)(1)(A) is premised on a benefit to the estate being conferred. In *In re Hillsborough Holdings Corp.*, the court stated "there must be an actual, concrete benefit to the estate before a claim is allowable as an administrative expense claim." 207 B.R. 299, 306 (Bankr.M.D.Fla.1997). With respect to § 503(b)(1)(A) administrative expense claims of unjust enrichment, the court stated:

> [T]he purpose of according priority in these cases [claims of unjust enrichment] is fulfillment of the equitable principle of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to [it].

*Id.* (internal quotations and citations omitted).

■ The benefit inquiry is subjective and must be made on a case-by-case basis. *See Broadcast Corp. of Georgia v. Broadfoot (In re Subscription Television of Greater Atlanta),* 789 F.2d 1530, 1532 (11th Cir.1986). In determining whether a concrete benefit is conferred in a particular case, a court must keep in mind that § 503(b)(1)(A) should be narrowly construed in order to maximize the value of an estate for the benefit of all unsecured creditors. *See Varsity Carpet Servs., Inc. v. Richardson (In re Colortex Indus., Inc.),* 19 F.3d 1371, 1377 (11th Cir.1994). Furthermore, the burden of proving entitlement to an administrative expense is on the claimant. *In re Fulwood Enters. Inc.,* 149 B.R. 712, 715 (Bankr.M.D.Fla.1993).

In this instance, it is clear that by seeking $750,000 Dake desires to be compensated for lost pre-petition effort(s) related to: (1) the pursuit of the subject land use and title changes; and (2) the marketing of the Property for sale (Debtor's Ex. 7 at Depo. p. 35). To illustrate, when Dake's principal, Gerald Dake, was asked what he considers to be the value of Dake's postpetition efforts regarding the pursuit of title to the marina basin area, Gerald Dake responded that he did not know (Debtor's Ex. 7 at Depo. p. 26). With respect to what work had been completed pre-petition, Gerald Dake stated the following:

> Pre petition, 99 percent of the zoning and land use effort [ ... ] and the title negotiations had been completed. Post petition there was very little zoning effort that had to be done yet [sic] and very little title work on our [Dake's] part that had to be done. The culmination of the title effort and the signing in 2011

by Moody [the Debtor] was mostly done by Mike [Miguel] Collazo and Hopping, Boyd & Sams in Tallahassee.

(Debtor's Ex. 7 at Depo. p. 12).

Dake nevertheless seeks $750,000 in what it couches as a reasonable figure derived, not from the "Early Termination Fee" provision of the pre-petition Agreement, but from a purported $5,000,000 to $10,000,000 in enhanced value to the Property (Debtor's Ex. 7 at Depo. p. 26).[10] These figures of enhanced value, however, are based on speculation and conjecture. There is no competent evidence before the Court indicating the land use and title changes have, in fact, enhanced the value of the Property to the extent asserted by Dake. To date, the Property has yet to be sold as a multi-use residential/commercial marina. Even Dake's principal, Gerald Dake, acknowledged that, due to the current economic climate, the present highest and best use of the property is that for which it is presently being used (i.e., a commercial shipyard) (Debtor's Ex. 7 at Depo. pp. 48–49).

Even if the Court were to find (which it does not) that the value of the Property has indeed been enhanced by $5,000,000 to $10,000,000 due to the Property's present land use and title posture, Dake readily admits that 99 percent of the work related to the land use and title changes had been completed pre-petition (Debtor's Ex. 7 at Depo. p. 12). Further, Gerald Dake acknowledges that most of this work, including any post-petition effort, was done by attorneys Harden and Collazo (see Debtor's Ex. 7 at Depo. p. 12; Tr. 2–25, 41–42, 55, 94). Therefore, even if the Property were enhanced by the maximum value asserted by Dake (i.e., $10,000,000), only 1 percent of this value can be attributable to post-petition effort(s) (i.e., $100,000). If this figure is further divided by the three individuals/entities responsible for the purported enhancement(s) (i.e., attorney Harden, attorney Collazo, and Dake), then the purported enhanced value attributable to Dake would be, at most, approximately $33,333.33. Based on the foregoing, the Court is simply unable to divine any basis for awarding Dake $750,000 as an administrative claim based on preservation of the Estate.[11]

On the other hand, however, the Debtor acknowledges that Dake's consulting efforts with respect to obtaining clear title to the marina basin area rendered a certain level of value to the Estate (see Tr. 113–14). Specifically, when asked his opinion as to the amount of post-petition value Dake contributed to the Estate, the Debtor's CFO, Mr. Albertini, testified it would be equivalent to that of attorney Harden (id.). Mr. Harden was awarded $18,593.75 in fees and $0.00 in costs (Doc. 1082). Gerald Dake testified that Dake's post-petition consulting efforts consisted of assisting attorney Collazo and surveyor Dean Privett in preparing necessary docu-

---

10. Dake bases its claim that the value of the Property has been enhanced by $5,000,000 to $10,000,000 on the Debtor's assertion(s) in its various applications to employ certain professionals, wherein it stated it believed the land use change to multi-unit residential/commercial, and having clear title to the marina basin, would enhance the value of the property by $5,000,000 to $10,000,000 (see Doc. 58 at 3; Doc. 69 at 3).

11. As noted previously, attorney Collazo (who Gerald Dake admits did most of the basin title work) received $23,973.24 in fees and $2,834.24 in costs as an administrative claim (Doc. 1112). Attorney Harden received, as an administrative claim, $18,593.75 in fees and $0.00 in costs (Doc. 1082).

mentation so that the basin area title issues could be resolved with the State of Florida (Tr. 22–25, 41–42, 46). Based on the aforementioned testimony, and the fact the vast majority of the time and costs expended by Dake were in relation to Dake's efforts to sell the Property (which never came to fruition) (*see* Dake Ex. 9; *see also* Tr. 33; Debtor's Ex. 7 at Depo. p. 12), the Court will award $18,000 to Dake under 11 U.S.C. § 503(b)(1)(A) for the actual and necessary costs of preserving the Estate.

## CONCLUSION

Based on the foregoing, it is **ORDERED:**

1. Gerald Dake & Associates, Inc.'s Application For Payment of Administrative Claim in the Amount of $750,000 (Doc. 737) is denied in part.

2. Pursuant to 11 U.S.C. § 503(b)(1)(A), Gerald Dake & Associates, Inc. is entitled to an administrative claim in the amount of $18,000.[12]

12. This amount includes any actual costs expended by Dake with respect to finalizing clear title to the marina basin area. The Court would note that Dake's itemized costs mostly relate to its marketing and sales efforts, and are nevertheless unreliable and speculative. In addition, the Court finds Dake's "office and associate support" costs, paid in monthly increments of $1,100.00 (representing 20 hours per month at a rate of $55.00 per hour) (Dake Exs. 9, 10) are overhead expenses which are not compensable under 11 U.S.C. § 503(b).